877 So.2d 164 (2004)
STATE of Louisiana, Appellee
v.
Terry CHEATHAM, Appellant.
No. 38,413-KA.
Court of Appeal of Louisiana, Second Circuit.
June 23, 2004.
*165 Terry Cheatham, Pro Se.
Louisiana Appellate Project by Carey J. Ellis, III, Rayville, for Appellant.
Walter E. May, Jr., District Attorney, James R. Hatch, Assistant District Attorney, for Appellee.
Before GASKINS, PEATROSS & HARRISON (Pro Tempore), JJ.
*166 PEATROSS, J.
Defendant, Terry Cheatham, was charged with attempted first degree murder for the shooting of Doyree Sturges in Haynesville, Louisiana. The charge was based on the facts that the shot was fired from an automobile and the victim was older than 65 years of age. See La. R.S. 14:27, infra, and 14:30 A(1) and (5).[1] After trial, the jury found Defendant guilty of attempted manslaughter, La. R.S. 14:27 and 14:31, infra, and he was subsequently sentenced to nine years at hard labor, with credit for time served. Defendant appeals, challenging the sufficiency of the evidence and the denial of his requested jury instruction relating to self-defense. For the reasons stated herein, Defendant's conviction and sentence are affirmed.

FACTS AND TESTIMONY
It is not disputed that on September 17, 2001, in the town of Haynesville, Defendant shot and seriously wounded the victim, Doyree Sturges. Mr. Sturges and Defendant, however, testified at trial and presented to the jury two very different versions of the shooting. Mr. Sturges testified that, on that day, he had contractors working at his home and, at about 12:30 p.m., he decided to go to Lisa's Kitchen, a local restaurant, to get a cup of coffee. Mr. Sturges testified that, at about 12:45 p.m. on September 17, he had his coffee in one hand and a cigar in the other and was walking across the street to sit and drink his coffee when Defendant drove by and called out that Mr. Sturges was a "son-of-a-bitch." Mr. Sturges testified that he paid no attention to the insult and sat down beside the sidewalk (on the curb), as was his usual routine, in the bank parking lot.[2]
After sitting down, Mr. Sturges looked up and saw that Defendant had turned his vehicle around and was approaching him. As Mr. Sturges stood up, his hands in front of him holding the coffee and cigar, he saw a gun pointing out of the window of Defendant's car. According to Mr. Sturges, Defendant shot him with a high powered rifle, striking him in the right arm and abdomen causing extensive damage.[3] The bullet also pierced his colon and liver and his right arm was nearly severed by the bullet. Mr. Sturges testified that Defendant drove away leaving him staggering in the parking lot. Mr. Sturges walked a few steps and fell to the concrete. He testified that he thought that two shots were fired, but admitted that he could not recall exactly because he was "out of it" after being shot and simply could not recall much after being hit.
Roy Shepherd testified on behalf of the State that he was at Lisa's Kitchen on the *167 afternoon of September 17, 2001. He noticed Mr. Sturges when he came in and ordered a cup of coffee. Afterwards, Mr. Shepherd was sitting in the restaurant when he heard a loud noise. He turned and saw Mr. Sturges across the street, staggering and bleeding. Mr. Shepherd did not see Defendant or Defendant's car.
Ruben Lewis, Kay Ivory and Julianka Robinson also testified for the State. At about 1:20 p.m., Mr. Lewis was standing in Lisa's Kitchen where he visited with Mr. Sturges for two or three minutes as Mr. Sturges bought a cup of coffee. Mr. Lewis also testified that he thought Mr. Sturges had a cigar with him. Ms. Ivory and Ms. Robinson were working in the restaurant that afternoon and Ms. Robinson served Mr. Sturges. The three testified that, a few minutes after Mr. Sturges left the restaurant, they heard a loud noise. They looked out the window of the restaurant and saw that Mr. Sturges had been shot. None of them saw the shooting and no one saw anyone around Mr. Sturges. Ms. Robinson called 911 and Mr. Lewis and Ms. Ivory ran to assist Mr. Sturges. Mr. Lewis helped Mr. Sturges to the ground and stayed with him until the ambulance and police arrived. When Mr. Sturges was asked who shot him, he replied, "Terry Cheatham." Neither Mr. Lewis nor Ms. Ivory saw any weapons around Mr. Sturges.
Detective Ben Booth with the Claiborne Parish Sheriff's Office, together with Chief James Garner, Officer David Mills and Officer Alan Nations with the Haynesville Police Department, testified at the trial about the investigation. At the location Mr. Sturges was shot, the officers found a large pool of blood, a foam coffee cup and a cigar. The officers did not find any weapons at the crime scene or in Mr. Sturges' personal effects.
Anthony Smith testified for the State that he was employed with the ambulance service that treated Mr. Sturges for his injuries. Mr. Smith transported Mr. Sturges to the hospital. He testified that he did not see any weapons on or near Mr. Sturges.
When the officers learned that Mr. Sturges had identified Defendant as the shooter, they immediately went to Defendant's home. They found Defendant on his porch waiting for them. After being read his rights, Defendant told the officers that he had shot Mr. Sturges with a .223 caliber rifle and that the gun was in a shed behind the house. Defendant consented to a search, which revealed the .223 caliber single-shot rifle in the shed with a fired shell casing still in the chamber. Defendant told Detective Booth that he had not cleared the rifle after firing it.
Defendant gave a voluntary statement to the officers, the tape of which was played for the jury. In this statement, Defendant told the officers that he used to cut Mr. Sturges' hair, but they had a misunderstanding about a lady, Almarie Russ. Defendant contends that Mr. Sturges had tried to start a relationship with Ms. Russ, with whom Defendant was romantically involved. He believed she was seeing both men. Defendant told the officers that he was alright with the situation, but that Mr. Sturges had been harassing Defendant over the issue. According to Defendant, this harassment included following him and coming into his driveway a couple of months before the shooting.
In his initial statement to the officers and during his trial testimony, Defendant said that, on the afternoon of September 17, 2001, he had gone to the hardware store to buy a saw blade he needed to do some roofing work on his house. He had the rifle on the front seat of his car because he carried it for safety when he *168 closed his barbershop after dark. On the way back home, Defendant saw Mr. Sturges in the bank parking lot and Mr. Sturges "beckoned" Defendant to stop. Defendant stated that, when he stopped his vehicle, Mr. Sturges began walking toward his car. Defendant further testified that he pointed his rifle at Mr. Sturges, not to shoot him, but to make him stop. Defendant testified that he told Mr. Sturges to stop, but Mr. Sturges continued to advance, stating, "I ought to shoot you." Defendant admitted that he did not see a weapon in Mr. Sturges' hand, but he testified that Mr. Sturges had his hands behind his back, giving Defendant the impression that he had a weapon. Defendant further testified that, when he pulled the trigger, he honestly believed that Mr. Sturges had a gun. Defendant acknowledged that, after he shot Mr. Sturges, he realized that Mr. Sturges' hand had been empty. Defendant testified that he did not want to wait to find out if Mr. Sturges had a weapon before firing.
Defendant admitted that he shot Mr. Sturges once; and, in his initial statement to officers, Defendant stated that he drove off after shooting Mr. Sturges. At trial, Defendant testified that, when Mr. Sturges was about three feet away from the car, he did not think, but closed his eyes and pulled the trigger. When he opened his eyes, he saw Mr. Sturges was leaning up against his car, holding his stomach. Defendant testified that he was very upset, never having shot anyone before. Not knowing what to do, Defendant decided to drive to his house, which was about three blocks away. When asked why the crime scene photographs did not show any blood near where he stopped his car, Defendant had no explanation other than that the blood must have been in Mr. Sturges' clothes. On cross-examination, Defendant acknowledged that he did not tell the police in his statement that Mr. Sturges had made it to his car or that Mr. Sturges had leaned up against his car after being shot.
Regarding the contact between the two men prior to the shooting, Defendant testified that, beginning in 2000, he overheard a phone call between Ms. Russ and Mr. Sturges about Mr. Sturges' possible relationship with Ms. Russ. The next morning, Mr. Sturges came to the Defendant's barber shop and denied he was doing anything with "that woman." Defendant testified that, thereafter, Mr. Sturges began making gestures and pointing at him when they would meet. Defendant testified that, prior to November 24, 2000, he had not done anything to harass Mr. Sturges. As far as Mr. Sturges harassing him, Defendant described how Mr. Sturges had come into his yard, followed him downtown and had told him that, not only would he come into his yard, he would come into his house.
Freddie Henderson testified on behalf of Defendant. He testified that three or four months prior to the shooting, he saw Defendant with a rifle in his car. When Mr. Henderson asked Defendant why he carried a rifle in his car, Defendant told him that he carried it to protect himself when he closed his business late.
Jimmy Meadors, who was helping Defendant put a new roof on his house on the day of the shooting, testified that, shortly before 1:00 p.m., he discovered that he needed a saw blade and Defendant offered to go buy the blade. Mr. Meadors noticed nothing unusual about Defendant's behavior prior to his leaving. When Defendant returned, he was very upset and told Mr. Meadors that he had just shot someone and that the police would be there soon. Mr. Meadors further testified that Defendant paid him for the roofing work, and he left before the police arrived.
Mr. Sturges' testimony significantly contradicted Defendant's version of the shooting. Mr. Sturges denied saying anything to Defendant before he was shot, and he *169 further denied signaling Defendant to stop or moving towards Defendant's vehicle after it was stopped. Mr. Sturges denied ever harassing or threatening Defendant prior to the shooting. He further denied knowing any reason why Defendant would want to shoot him.
While he denied ever arguing with Defendant prior to the incident, Mr. Sturges did describe "run-ins" with Defendant wherein Defendant would harass him in public and by telephone. Mr. Sturges could not place a time frame on any of these threats, but estimated that it had been going on for about a year before the shooting. He reported the harassment to the police and it slacked off for a while, but did not stop completely. In this regard, Jason Branch, with the Haynesville Police Department, testified that, before the shooting, Mr. Sturges came to the police station and made a complaint about Defendant harassing him. On November 24, 2000, Officer Branch and Officer Mills found Defendant at a football game and told him about the complaint. At that time, Defendant told the officers he would "drop everything and leave it alone."
Mr. Sturges also denied knowing Ms. Russ or ever seeing her with Defendant. It was undisputed that Ms. Russ had a romantic relationship with Defendant, but there was conflicting testimony as to whether or not Mr. Sturges knew her and/or had tried to have a relationship with her. Mr. Sturges denied any attempt to date Ms. Russ, stating that he would not know her if she walked in the room. He denied ever following Defendant to his home or making any kind of threats to Defendant.
Ms. Russ testified that she had an ongoing relationship with Defendant and that Mr. Sturges had tried to date her. She further testified that she was not aware that Defendant knew that Mr. Sturges had tried to date her. She also denied knowing that there were any problems between the two men. On cross-examination, however, Ms. Russ testified that, on several occasions when she was in a vehicle with Defendant, they would pass Mr. Sturges and he would shake his fist or make gestures at her and Defendant. Ms. Russ testified that Defendant complained to her about Mr. Sturges harassing him. Ms. Russ also described a phone call to Mr. Sturges where Defendant was also listening in to determine if Mr. Sturges had been attempting a relationship with Ms. Russ.
After both sides rested, a charge conference was held outside the presence of the jury. Defendant offered a proposed jury instruction which stated:
The State has the burden of proving, in a case of this nature, beyond a reasonable doubt, that the defendant did not act in self-defense.
See State v. Lombard, 486 So.2d 106 [(La.1986)].
The trial court denied the proposed instruction, finding that it did not correctly state the law in non-homicide cases.
As previously stated, the jury found Defendant guilty of the responsive verdict of attempted manslaughter. The trial court ordered a presentence investigation report and subsequently sentenced Defendant to nine years at hard labor, with credit for time served. This appeal ensued. We note that, in addition to the brief filed by counsel on behalf of Defendant, this court granted Defendant leave to file a supplemental pro se brief, which has been reviewed on appeal.

DISCUSSION

Assignment of Error Number One: The state failed to present sufficient evidence to support the verdict, a conviction of attempted manslaughter.
Defendant argues that the evidence was insufficient to prove that he had the specific *170 intent to kill or cause the victim great bodily harm in light of suspicious and inconsistent testimony of the victim which creates reasonable doubt concerning Defendant's guilt of attempted manslaughter. In his pro se supplemental brief, Defendant argues inconsistencies in the victim's testimony as a basis that he should not have been convicted. On the other hand, the State argues that specific intent is a jury question, and the jury was able to evaluate Defendant's and the victim's testimony as to the crime, and the jury's credibility determinations leading to Defendant's conviction of attempted manslaughter should not be disturbed.
La. R.S. 14:27 provides:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.
La. R.S. 14:31(A) provides, in pertinent part:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or ...
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Hunter, 33,066 (La.App.2d Cir.9/27/00), 768 So.2d 687, writs denied, 00-3070 (La.10/26/01), 799 So.2d 1150, 01-2087 (La.4/19/02), 813 So.2d 424. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
Specific intent to commit a crime is an element of an attempted offense. La. R.S. 14:27. Hence, a conviction of an attempted offense must rest upon sufficient proof that the offender actively desired to cause the proscribed criminal consequences to follow his act or failure to act and that the offender committed or omitted an act for the purpose and tending *171 directly toward the accomplishing of his object. La. R.S. 14:10, 14:27. See State v. Parish, 405 So.2d 1080 (La.1981), appeal after remand, 429 So.2d 442 (La.1983).
Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Fuller, 414 So.2d 306 (La.1982); State v. Doby, 540 So.2d 1008 (La.App. 2d Cir.1989), writ denied, 544 So.2d 398 (La.1989). Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the proscribed criminal consequences to follow his act. La. R.S. 14:10(1); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. McCray, 621 So.2d 94 (La.App. 2d Cir.1993).
The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982); State v. Butler, 322 So.2d 189 (La.1975); State v. Dean, 528 So.2d 679 (La.App. 2d Cir.1988). In reviewing the correctness of such a determination, the court should review the evidence in a light most favorable to the prosecution and must determine if the evidence is sufficient to convince a reasonable trier of fact of the guilt of the defendant beyond a reasonable doubt as to every element of the offense. Jackson v. Virginia, supra; State v. Huizar, supra.
In the present case, this issue can be resolved by applying the law regarding specific intent to Defendant's own version of the shooting. Defendant argues that the State did not prove he had the requisite specific intent; however, it is apparent that the jury chose to believe Defendant's version of the shooting when it rendered a reduced verdict of attempted manslaughter. Although the evidence presented could have supported a greater verdict, when considering Defendant's version of the facts in a light most favorable to the State, there still is sufficient evidence to support a reasonable jury's verdict of attempted manslaughter.
Manslaughter is defined as a homicide that would have been "either first or second degree murder but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection." La. R.S. 14:31(A)(1). Mr. Sturges described the classic case of an attempted first or second degree murder. Defendant drove past him, turned his car around, stopped, pointed a rifle out the window and shot him at point-blank range without provocation. In addition, Mr. Sturges was over the age of 65. This evidence clearly would have been sufficient to have supported a jury verdict of either attempted first or second degree murder, based on Defendant's engaging in a drive-by shooting and the victim being over 65 years of age.
On the other hand, Defendant described how he drove into town to buy a saw blade, was beckoned over by Mr. Sturges, who then allegedly threatened him. Defendant testified he shot Mr. Sturges because of an impression that he might have been armed. Defendant described to the jury a history of alleged problems with Mr. Sturges. He also described to the jury how he shot Mr. Sturges without thinking and without ever seeing any weapon. In reaching the lesser verdict of manslaughter, the jury chose to give less weight to Mr. Sturges' testimony denying any involvement in an ongoing dispute with Defendant and as to how the shooting occurred.
*172 Defendant argues that, because of alleged inconsistencies in Mr. Sturges' testimony, the jury could not have reasonably found that he had the specific intent to kill or to cause great bodily harm when he fired. The fact that Mr. Sturges' testimony may have had inconsistencies, however, does not support Defendant's claim that the State failed to prove he had the specific intent to kill or cause great bodily harm when he shot Mr. Sturges. This court has repeatedly held that the discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or to inflict great bodily harm upon that person. State v. Murray, 36,137 (La.App.2d Cir.8/29/02), 827 So.2d 488, writ denied, 02-2634 (La.9/5/03), 852 So.2d 1020; State v. Johnson, 27,522 (La.App.2d Cir.12/6/95), 665 So.2d 1237. The jury could have easily inferred that Defendant, in shooting Mr. Sturges at very close range with a high-powered rifle, had the specific intent to kill him.
This assignment is without merit.

Assignment of Error Number Two: It was error to deny Defendant's requested jury instruction pertaining to the State's burden of proof in relation to the claim of self-defense.
Defendant argues that the trial court erred in not shifting the burden of proving self-defense to the State. Specifically, he argues that the trial court erred by refusing to instruct the jury that the State had the burden of proving that his shooting of Mr. Sturges was not in self-defense. The trial court refused Defendant's proposed jury instruction, noting that the cited law was applicable in homicide cases, not non-homicide cases. We find no error in the trial court's action.
La. R.S. 14:19 provides:
The use of force or violence upon the person of another is justifiable, when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession; provided that the force or violence used must be reasonably and apparently necessary to prevent such offense, and that this article shall not apply when the force or violence result in a homicide.
Self-defense is justification for a killing only if the person committing the homicide reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that deadly force is necessary to save his life. La. R.S. 14:20(1); State v. Cotton, 25,940 (La.App.2d Cir.3/30/94), 634 So.2d 937; State v. Jones, 600 So.2d 875 (La.App. 1st Cir.1992), writ denied, 92-2351 (La.5/12/95), 654 So.2d 346. The state has the affirmative duty of proving beyond a reasonable doubt that a killing was not in self-defense. State v. Arnold, 30,282 (La.App.2d Cir.1/21/98), 706 So.2d 578.
Based on La. R.S. 14:19, supra, however, this court, along with other courts, has held that the burden of proof of self-defense in a non-homicide case rests upon the defendant, not the state. State v. Mason, 499 So.2d 551 (La.App. 2d Cir.1986). In Mason, this court based its ruling on the earlier case of State v. Freeman, 427 So.2d 1161 (La.1983), wherein the supreme court held:
... [i]n the non-homicide situation, the defense of self-defense requires a dual inquiry; an objective inquiry into whether the force used was reasonable under the circumstances; and subjective inquiry into whether the force used was apparently necessary ... The burden of persuasion in proving self-defense in a non-homicide situation pursuant to La. R.S. 14:19, which entails a subjective as well as an objective inquiry, could arguably, in fairness to the State, be upon *173 the defendant, since a subjective inquiry is involved.
This court has most recently followed this ruling in State v. Robinson, 37,043 (La.App.2d Cir.5/14/03), 848 So.2d 642, where we also noted that the defendant's burden of proving self-defense in a non-homicide case is by a preponderance of the evidence, not beyond a reasonable doubt.
We also note that not shifting the burden of proving self-defense to the defendant in non-homicide cases would result in an onerous burden on the State to disprove subjective influences on the defendant since it would only be the defendant who has these facts at his disposal to produce to the court. See State v. Rainey, 98-436 (La.App. 5th Cir.11/25/98), 722 So.2d 1097, writ denied, 98-3219 (La.5/7/99), 741 So.2d 28.
The burden of meeting the objective inquiry as to whether the force used by the defendant was reasonable under the circumstances fails if it reasonably appears from the facts that the crime could have been prevented by any other available means, such as by a warning, by a show of force or by the use of any force short of the shooting of the victim. State ex rel. D.P.B., 02-1742 (La.5/20/03), 846 So.2d 753.
In the case sub judice, Defendant's own version of the shooting fails to meet this initial objective inquiry, since Defendant clearly had several, non-violent options readily available. First, when being "beckoned" by a man with an alleged history of harassing him, Defendant could have merely driven away. Second, after stopping to talk, and finding Mr. Sturges to be threatening, Defendant could have easily driven off and contacted the police. Third, even if Defendant was justified in stopping his car and pointing his rifle at Mr. Sturges because of an alleged belief that Mr. Sturges held a weapon behind his back, Defendant could have waited until he was certain that Mr. Sturges was armed with a weapon before shooting him. Defendant clearly had the advantage of already having his rifle pointed at Mr. Sturges and the advantage of being in a running vehicle that he could have driven away. This gave Defendant the option of warning Mr. Sturges not to act rashly. Had Mr. Sturges pulled out a stick or pocket knife or even a gun from behind his back, Defendant, sitting in his car and armed with a high-powered rifle, could still have driven away and sought the authorities to resolve the matter.
For these reasons, we conclude that the trial court was not in error to deny Defendant's proposed instruction on self-defense. This assignment of error is without merit.

CONCLUSION
For the foregoing reasons, Defendant's, Terry Cheatham, conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] La. R.S. 14:30 A states, in pertinent part:

A. First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, drive-by shooting, first degree robbery, simple robbery, or terrorism.
* * *
(5) When the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is under the age of twelve or sixty-five years of age or older.
[2] The uncontradicted testimony of several witnesses at trial established that Mr. Sturges had a daily routine of buying a cup of coffee at Lisa's Kitchen and sitting in the parking lot of the nearby drive-thru Hibernia Bank to drink it before getting back in his truck and leaving.
[3] Other evidence established that the rifle was a single shot and that only one shot was fired. The bullet caused both injuries.