LOLLEY, J.
1 ,This criminal appeal arises from the First Judicial District Court, Parish of Caddo, State of Louisiana. A jury found Lucien Jamar Trammell guilty of attempted first degree murder, a violation of La. R.S. 14:27 and 14:30. After being convicted of this crime and pleading guilty to being a third felony habitual offender, Trammell was sentenced to 58 years at hard labor without benefit of probation or suspension of sentence. Trammell appeals his conviction. For the following reasons, Trammell’s conviction is affirmed; his sentence is amended to state that his sentence be served at hard labor, without benefit of probation, parole, or suspension of sentence; and his sentence is affirmed as amended.
Facts
On January 29, 2008, Officer John Mad-jerick of the Shreveport Police Department (“SPD”) was working as part of a burglary grant due to a recent spike in the number of burglaries in an area of Shreveport. Officer Madjerick was instructed to go into the identified area and make contact with as many people as possible, get contact information from them, and complete field interview cards including fingerprinting. The concept of the grant was to create more of a police presence in the area and deter future burglaries.
While driving on Suntan Street in his marked police vehicle, Off. Madjerick noticed Lucien Trammell walking in the middle of the street. Officer Madjerick stopped him in order to fulfill his duties associated with the burglary grant. He pulled up next to Trammell, addressed him, and told him to come to the front of the police car; Trammell did not comply. An ^altercation ensued and Off. Madjerick was shot in the face; he survived the shooting and after two surgeries is able to work again as a police officer. Trammell fled the scene but was later arrested near Houston, Texas.
Trammell was charged with attempted first degree murder and convicted by a jury of this charge. He pleaded guilty to being a third felony habitual offender and was sentenced as such to 58 years at hard labor without benefit of probation or suspension of sentence. Trammell now appeals his conviction.
Applicable Law
On appeal Trammell raises the issue of sufficiency of the evidence for his conviction. He argues specifically that the shooting occurred accidentally when both Off. Madjerick and himself were struggling for control of his gun; he claims the state failed to establish that he had the specific intent requisite to support his conviction. We disagree.
As stated in La. R.S. 14:27, in pertinent part:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
As stated in La. R.S. 14:30, in pertinent part:
A. First degree murder is the killing of a human being:
⅜ ⅜ ⅝ ⅝ ⅜ ⅜
(2) When the offender has a specific intent to kill or to inflict great bodily harm upon a fireman, peace officer, or civilian employee of the Louisiana State Police Crime Laboratory or any other forensic laboratory engaged in the performance of his lawful duties, or when the specific intent to kill or to inflict | .-¡great bodily *208 harm is directly related to the victim’s status as a fireman, peace officer, or civilian employee.
B. (1) For the purposes of Paragraph (A)(2) of this Section, the term “peace officer” means any peace officer, as defined in R.S. 40:2402, and includes any constable, marshal, deputy marshal, sheriff, deputy sheriff, local or state policeman, commissioned wildlife enforcement agent, federal law enforcement officer, jail or prison guard, parole officer, probation officer, judge, attorney general, assistant attorney general, attorney general’s investigator, district attorney, assistant district attorney, or district attorney’s investigator.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.05/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appre ciation of the evidence for that of the factfinder. State v. Pigford, 2005-0477 (La.02/22/06), 922 So.2d 517. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness. State v. Casey, 1999-0023 (La.01/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). The reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. Id.
l/The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 1994-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.02/25/09), 3 So.3d 685, writ denied, 2009-0725 (La.12/11/09), 23 So.3d 913.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence, must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that a defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.01/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/06/09), 21 So.3d 299.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App.2d Cir.02/13/08), 975 So.2d 753.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the |awitnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, supra.
Attempt requires both the specific intent to commit a crime and an act for the purpose of, or an “overt act,” tend *209 ing directly toward accomplishment of that crime. State v. Caston, 43,565 (La.App.2d Cir.09/24/08), 996 So.2d 480. Specific intent to commit a crime is an element of an attempted offense. La. R.S. 14:27. The state has the burden of proving the defendant’s specific intent to commit the charged crime. State v. Browhow, 41,686 (La.App.2d Cir.12/13/06), 945 So.2d 890. Conviction of an attempted offense must rest upon sufficient proof that the offender actively desired to cause the prescribed criminal consequences to follow his act or failure to act and that the offender committed or omitted an act for the purpose and tending directly toward the accomplishing of his object. Id.; La. R.S. 14:10, 14:27.
The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Brown, 618 So.2d 629 (La.App. 2d Cir.1993), writ denied, 624 So.2d 1222 (La.1993). Specific intent to commit a crime is an element of an attempted offense. La. R.S. 14:27. Hence, a conviction of an attempted offense must rest upon sufficient proof that the offender actively desired to cause the prescribed criminal consequences to follow his act or failure to act and that the offender committed or omitted an act for the purpose and tending directly toward the accomplishing of his object. La. R.S. 14:10, 14:27. See State v. Cheatham, 38,413 (La.App.2d Cir.06/23/04), 877 So.2d 164, writ denied, 2004-2224 (La.06/24/05), 904 So.2d 717. The state must prove that the offender had the specific intent to kill, not merely intent to cause great bodily harm, in order to convict a defendant of attempted murder. State v. Butler, 322 So.2d 189 (La.1975).
The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Seals, 1995-0305 (La.11/25/96), 684 So.2d 368, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Dooley, 38,763 (La.App.2d Cir.09/22/04), 882 So.2d 731, writ denied, 2004-2645 (La.02/18/05), 896 So.2d 30.
Flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. State v. Durden, 36,842 (La.App.2d Cir.04/09/03), 842 So.2d 1244, writ denied, 2003-1350 (La.11/26/03), 860 So.2d 1131.
Discussion

Sufficiency of the Evidence

As stated, on appeal Trammell challenges the sufficiency of the evidence used to convict him. Specifically, Tram-mell argues that the state failed to show that he intentionally shot Off. Madjerick. The defendant contends he did not lie in wait for the officer, or plan an intentional shooting, but that the shooting was an accident that resulted from his struggle with the officer over the weapon.
|7The trial of Lucien Trammell included physical evidence as well as the testimony of 22 witnesses to support his conviction, many of whom were police officers who assisted in the investigation. A summary of the most pertinent witness testimony follows.

Officer John Madjerick

At the trial on the matter, Off. Madjer-ick testified that he started working for the SPD in February 2007. He explained he began his solo patrol after his training was complete in October 2007, four months prior to the shooting. On January 29, 2008, the date of the shooting, Off. Madjer-ick testified that although it was supposed to be his day off, he agreed to work overtime on a burglary grant. He explained there had been a recent spike in burglaries *210 in certain areas during daytime hours and the officers assigned to work the grant were to make a presence in those areas. He testified that the purpose of the job was to “make contact with as many people as we could, get good contact information from them, if we could, complete field interview cards, which is a card with basic information and we get a thumb print maybe to possibly match any fingerprints that were lifted from burglary scenes or anything like that.” Officer Madjerick testified that he was wearing his full uniform when he patrolled the area and that he was driving a marked police vehicle. While patrolling the Sunset Acres/Garden Valley neighborhood shortly before noon as part of his patrol, he noticed the person who would later be identified as Lucien Trammell walking in the middle of the road, heading south, away from him on Suntan Street. Officer Madjerick testified he took a right turn and pulled his vehicle up next to isTrammell. He explained that Trammell moved to the side of the road once he saw the police vehicle; there are no sidewalks on Suntan Street. Officer Madjerick testified that his intention was to stop Trammell for investigatory purposes of the burglary grant, check for warrants, and possibly complete a field interview card. Although he noted that Trammell was technically violating a city ordinance by walking in the center of a road, he was not intending to arrest him. Officer Madjerick exited the vehicle, at which time the audio recording system attached to his belt, as well as the video camera mounted in his patrol car, were activated and began recording the events.[1]
Officer Madjerick testified that after exiting the vehicle he approached Trammell to begin a conversation with him; he asked Trammell to come to the front of the vehicle but Trammell just stood in place and did not approach the vehicle. Officer Madjerick stated he asked Trammell again to approach the vehicle, but Trammell still did not respond. Officer Madjerick stated he then reached out his arm to guide Trammell to the front of the vehicle, but Trammell resisted. Officer Madjerick testified there were a few reasons he wanted Trammell to come to the front of the vehicle: the hood of the car provided a hard surface where Trammell could put down the CD player he was holding and upon which he could fill out the interview card, and he also wanted to be in a good position to capture the encounter on the video from the camera mounted on the vehicle’s dashboard. Officer Madjerick stated Trammell began yelling at someone down the street causing Off. Madjerick to grow suspicious that this behavior might be a |gploy to distract him. He also testified that Tram-mell stated he wanted to put his CD player in his pocket, but this behavior also made him concerned for his safety so he did not allow Trammell to go into his pockets. At this point, Off. Madjerick testified, Tram-mell was noncompliant, so he radioed for another unit to give him assistance. Officer Madjerick testified that when Tram-mell went to the side of the vehicle Off. Madjerick attempted to get him to move back in front of the camera, but Trammell physically resisted. He testified that Trammell started to walk away, but Off. Madjerick grabbed him. At this point, Off. Madjerick stated, his memory got “fuzzy.” He stated he was going to try to bring Trammell “down,” but Trammell got loose and faced Off. Madjerick, pointing “something dark” at him. He testified Trammell said to him, “Give me your gun. *211 Give me your gun.” Officer Madjerick testified that he told Trammell either, “Come get my gun” or “I’ll give you my gun,” as Off. Madjerick put his hand on his own gun. Officer Madjerick testified he next felt an impact on his face and he got knocked to the ground. He testified he did not feel pain, but a tingling sensation.
Officer Madjerick testified he was wearing gloves throughout the entire encounter, and he did not touch, reach for, or struggle for Trammell’s gun.
Officer Madjerick also testified that Sergeant Stephen Plunkett of the SPD came to his aid shortly after the shooting. Officer Madjerick stated he gave him a description of the person who shot him. Although he could only Imgive a general description at the time, he knew that the same person captured on the video was the persomwho shot him.
Officer Madjerick also explained to the jury the procedure necessary to take his gun out of his holster. He showed the jury the process that consists of several steps and he explained that there are safety mechanisms built into the holster to make it difficult for a suspect to pull the gun out.
Officer Madjerick additionally testified as to the injuries he sustained from the shooting. He stated he was shot in his left cheek about a half of an inch from the corner of his mouth. He explained that the bullet missed his teeth, hit his jawbone, veered toward the center of his neck, fractured a vertebra, and exited through the back of his head.

Sergeant Stephen Plunkett

Sergeant Stephen Plunkett testified that he worked for the SPD for 18 years and that on the day of the shooting his role was to assist officers during the burglary operation. He testified that he heard Off. Madjerick state over the police radio that he was stopping an individual and then about 10 seconds later he heard Off. Mad-jerick indicate he needed assistance. Since Sgt. Plunkett was only about 1 ½ blocks away from where Off. Madjerick was located, he immediately drove to the scene, intending to assist with the interview. He testified he was the first person on the scene after the shooting and he found Off. Madjerick on the ground perpendicular to his car and bleeding from his face and the back of his head. Sergeant Plunkett testified that Off. Madjerick was conscious and able to speak at that time, but he gurgled when he attempted to do so because his mouth kept Infilling up with blood. Sergeant Plunkett testified that Off. Madjerick told him “he shot me.” He also testified to finding the entry and exit wounds in Off. Madjerick’s head and applying pressure to them with his fingers. He explained that he had Off. Madjerick write down a description of the shooter on a notepad. He testified that Off. Madjer-ick wrote “black hoodie.” At this time the video that was captured from Off. Madjer-ick’s vehicle was played for the jurors to view. Sergeant Plunkett then demonstrated for the jury how to remove a police gun from the holster, as well.

Keldrick Cornelius

Keldrick Cornelius is the only eyewitness to the shooting other than the defendant, Trammell, and the victim, Off. Mad-jerick. Cornelius testified that he lived at 7201 Suntan Street with his mother and several others. He testified that he knew Trammell from the neighborhood and that they had hung out together on occasion. Cornelius testified that on the day of the shooting he left his house in the middle of the day to get his hair braided. While walking down the street he heard Tram-mell call out his nickname, KC. He testified that he told Trammell he was on his way to get his hair braided and did not *212 want to stop. When Trammell continued to call him, he testified, he turned around and saw Trammell and a police officer, who he would later learn was Off. Madjer-ick, going around in circles. He testified that the officer was telling Trammell to “come here,” but it was apparent that Trammell did not want to comply. Cornelius described the officer’s demeanor as “pretty calm” and not upset. Cornelius then testified that he |12heard Trammell say, “Yeah, now you give me your gun” as he pointed a gun at the officer and “that’s when he shot him.” He testified that he then saw the officer hit the ground and Trammell run away. Cornelius stated that the officer never pointed a gun at Tram-mell. Cornelius testified that he continued walking as if nothing had happened because he did not want to be a part of the incident.
Cornelius described that some moments after the shooting he was stopped by a different police officer who questioned him. Cornelius lied and told the officer he had not seen anything regarding the shooting. He stated the officer did not believe him so he put him in the police car in order to take him to the station for questioning. The officer took him to his home first, Cornelius testified, in order to gather proof of his identification. His brother, Isaiah Turner, was in the house when they arrived, so Turner brought the officer Cornelius’s identification as requested.
Once at the police station, Cornelius admitted to the officers that he had seen the shooting. This conversation was recorded and the jurors were allowed to hear the recording of the police questioning as well as Cornelius’s responses. When asked why he had lied about not witnessing the shooting Cornelius testified that he lied because “I didn’t want nothing to do with this.” Cornelius maintained throughout his testimony that he had, in fact, witnessed Trammell shoot Off. Madjerick in the face. He also testified that he picked an image of Trammell out of a photographic lineup.

J^Tori Cason

Tori Cason testified that she was at Cornelius’s home visiting Isaiah Turner, Cornelius’s brother, with whom she was in a relationship, when the shooting occurred. She testified that she was cooking in the kitchen when Cornelius left to get his hair braided. As she continued to cook and Turner began watching a movie, she testified, they heard a gunshot. She stated she and Turner looked outside but saw nothing unusual so they returned to their activities. She testified that she then heard a knock at the door and found it was Trammell at the door, whom she had met several times. She testified that Trammell wanted to come inside but Turner told him he could not come in because Cornelius was not home. She then explained that Trammell went to the side door where he told them that the cops were after him and he needed to come in. Cason testified that when Turner again denied Trammell access, he asked again. She stated Trammell seemed panicked and acted as if he was in a rush. She then explained that Trammell went to the back of the house where the kitchen window was located, busted it in, and came through the window, cutting his arm in the process. She testified that after she refused to help him wrap his bleeding arm, Trammell wrapped his own gashed arm with a blue and white Polo brand shirt that he had when he came to the window. At this point, Cason testified, Trammell was acting very panicked, walking back and forth and looking out the windows.
Cason described that a police officer then pulled up to the home and Turner walked outside to speak with him. She explained that she was scared so she *213 locked herself in the bathroom. Cason testified that when | ]4Turner returned from speaking with the officer, he stated that the officer had Cornelius in the back of the police car. Cason testified that Trammell stated that the police would know that Cornelius was uninvolved in the shooting because of the video from the police car. According to Cason, Trammell then changed out of his clothes and put on some of Cornelius’s clothes, because he stated the police were after him. She then stated she saw an ambulance.
Trammell explained to Cason that he had shot a gun, but that he did not shoot anyone. She recalled asking Trammell where the gun was located, and he stated he had gotten rid of it. Cason testified that at this point she was “freaked out,” because she thought Trammell had shot someone, and she tried to leave the home. But, she testified, Trammell would not let her because “it would look suspicious.” She stated that Trammell tried to block the door so she could not leave but Turner told him to let her go, so she was able to leave the home.
At this point, Cason stated, Trammell left the home as well. At first, she explained, the two of them traveled in the same direction until they eventually split up when she tried to go to her parents’ home. She then noticed the streets were blocked and there were police and neighbors all over. Cason finally called her mother and told her that she knew the identity of the shooter, at which point she found out a police officer had been shot. Cason’s mother arranged for a detective to speak with Cason and she told the detective everything she knew. She also stated she identified Trammell in a photographic lineup.

]KOfficer Danny Buddy

Officer Danny Duddy testified that he worked for the SPD for 20 years, including 15 years in the crime scene investigations unit as a certified latent print examiner and crime scene investigator. He described the process of comparing a known fingerprint to a latent fingerprint to determine if the two were from the same individual. He was qualified as an expert in his field. He testified that on the day of the shooting he was dispatched to the scene and processed the hood of Off. Mad-jerick’s patrol vehicle for latent prints. He testified that one print was developed, but it was matched to an individual who was unrelated to this case. He testified that he also compared a latent print from the CD player Trammell left on the scene with a known fingerprint from Trammell and determined that the prints matched. Trammell stipulated that his prints were on the CD player.

Corporal Breanna Rivera

Corporal Breanna Rivera testified that she worked for the SPD for 9 ½ years and was currently assigned to patrol investigations. On the day of the incident, she explained, she heard about the shooting over the police radio and responded to the scene. Corporal Rivera testified that she began conducting yard-to-yard searches and contacting residences in the neighborhood in order to recover any evidence. While searching, she came to a vacant lot on Brandtway Street. There, she stated, she recovered a black semi-automatic firearm on the ground in the corner of the lot. She stated she taped off the location and radioed for other officers to assist. The gun was then collected by Corporal Tommy Rachal of the SPD.
1 ic/erome Voiles
Jerome Vailes testified that he managed Cash In a Flash, a local pawn shop. He testified to selling firearms at this pawn shop and that there are many forms and regulations involved when selling firearms. He testified that Henry Trammell, who *214 would later be identified as Luden Tram-mell’s brother, had purchased two Glock handguns in 2006, one a 9mm and one a .40 caliber from the pawn shop.

Dr. David Kim

Dr. David Kim testified to being the oral and maxillofacial surgeon at Louisiana State University Health Sciences Center in Shreveport who treated Off. Madjerick for the injuries he sustained from the shooting. He described that Off. Madjerick had a bullet entry wound in his left cheek and inside his mouth as well as a bullet exit wound in the posterior part of the left oral cavity. He explained that entry wounds are more defined and he could clearly tell that the wound in Off. Madjerick’s cheek was from a bullet entry. He also explained that the wound in the back of his neck was less defined and more irregular, so it was clearly an exit wound. He also explained that the bullet fractured Off. Madjerick’s spine, but because of the area of the spine that was impacted, no paralysis or extremity problems resulted.
Dr. Kim testified that Off. Madjerick’s jaw was fractured in several places and required reconstructive surgery. The surgery, he explained, consisted of creating an incision along the lower jaw in order to remove the |17bone fragments and placing a titanium reconstruction plate over the intact areas of the lower jaw to bridge the area and keep it in alignment.
After the surgery was complete, Dr. Kim testified, he followed up with Off. Madjerick and had to perform a second surgery in August of 2008, when the officer began having problems opening his mouth because of the scar tissue that had formed in the area. Dr. Kim also testified that he performed a bone graft of the missing area of the mandible at this time, as well.

Detective Lane Smith

Detective Lane Smith testified that he worked for the SPD for over 12 years, nine of which he has spent in the violent crimes unit. On the day of the incident, Det. Smith testified, he interviewed both Tori Cason and Keldrick Cornelius. He testified that Cason was cooperative, forthcoming with her information, easy to question, and explained what she knew. Cason told Det. Smith that Trammell said a family member would take him to Texas, and she also identified Trammell from a photographic lineup. When interviewing Cornelius, Det. Smith stated, it was more difficult-he was short with his answers, inconsistent, and stated he did not want to be involved. Detective Smith testified he believed this was because Cornelius was friends with Trammell. However, he testified, Cornelius became more forthcoming as the interview went on, and his story became consistent with Cason’s statements as well as the facts. Detective Smith described two especially noteworthy moments in the interview: first, when Cornelius stated he knew the officer had been shot in the head, a fact that Det. Smith 11Rtestified had not been disclosed outside of the investigation; and second, when Cornelius stated in the interview that Trammell said to the officer, “Give me your gun.” Det. Smith testified that this fact was not even known to the investigators at the time; however, this statement was later heard on the police video capturing the incident, corroborating Cornelius’s testimony as to the statement and his presence at the shooting.

Corporal Tommy Rachal

Corporal Tommy Rachal testified to being a member of the SPD for over 15 years. On the day of the shooting, he testified, he was called to a vacant lot near the crime scene where a firearm had been discovered. Corporal Rachal testified that *215 he processed the scene by photographing it and collected the gun. He processed both the gun and the magazine for fingerprints, but was unable to identify any. He also testified that the magazine of the gun was loaded when it was found, and based on the number of cartridges in the magazine, it appeared that one round had been fired from the gun. Corporal Rachal also testified that he swabbed the gun, Tram-mell, and Off. Madjerick in order to compare their known swabs to the DNA found on the gun. Corporal Rachal then testified that he processed the belongings in Off. Madjeriek’s possession the day of the shooting. He testified that Off. Madjer-ick’s gun was in his holster and contained a full set of bullets.

Detective Rod Demery

Detective Rod Demery testified to being a part of SPD for over 10 years. On the day of the shooting, he testified, after checking on Off. | 19Madjerick’s condition at the hospital, he learned that the suspected shooter was Lucien Trammell. Detective Demery testified he had a prior relationship with Lucien Trammell’s brother, Henry Trammell, so he called Henry Trammell and asked if he could be put in contact with Lucien Trammell. He testified that he did speak to Lucien Trammell and this recorded conversation was partially played and partially read for the jury.[2] In this conversation, Det. Demery tried to persuade Lucien Trammell to come to the police station and tell his side of the story, while assuring him he would be treated fairly, and he would be safe. During this conversation, Lucien Trammell admits to wrestling with Off. Madjerick and pushing the officer before running away and hearing shots. He stated when he heard the shots he believed either Off. Madjerick or someone else was shooting at him. Det. Demery testified that Lucien Trammell did not claim shooting the officer in self-defense or that the officer accidentally shot himself during a struggle over the gun. Detective Demery used the cell phone number from which Lucien Trammell was calling to track him to Humble, Texas, near Houston. Simultaneously, Lucien Trammell told Det. Demery the general area where he was located. With this information, the SPD was able to coordinate with the local police department in Texas to facilitate Lucien Trammell’s arrest and transport.

_|^Deputy Bryant Cross

Deputy Bryant Cross of the Harris County Sheriffs Office in Texas, testified that he detained Trammell in the Houston area. His job, he testified, was to transport Trammell; therefore, he did not question him or perform any sort of investigation. However, he testified, Trammell voluntarily made statements while riding in the back of the police vehicle, which Deputy Cross transcribed. Some of the statements included:
I didn’t shoot that law man and they already have two n* ***** in custody. All I was doing was minding my own business walking in the middle of the street. That cop came at me.
All I was doing was minding my own business walking in the middle of the street, that cop came at me. He grabbed me by the back of my jacket and turned me around.
I didn’t want to go to jail but when he grabbed me I just shoved him away and took off running. When I was running I heard some shots. I thought he was *216 shooting at me so I was zigging and zagging.
If the cop got shot it was one of those other n* * * * * *, it wasn’t me.
I can’t believe they think I shot that law man, it must have been one of those other n* * * * * *.

Connie Lee Brown

Connie Lee Brown, the Senior Forensic Scientist in the DNA section of the North Louisiana Crime Lab at the time of the shooting investigation, was qualified as an expert in forensic DNA analysis. She testified that she was responsible for some of the DNA testing associated with this case. She stated that the gun found in the vacant lot was tested for DNA with the following results: the grip had DNA from three different people and neither Tram-mell nor Off. Madjerick could be excluded; the top portion of the gun [21that gets pulled back, called the slide, contained DNA from two people and Trammell could not be excluded but Off. Madjerick could be excluded; the trigger contained DNA evidence from three different people and neither Trammell nor Off. Madjerick could be excluded. Brown testified that when a shooting occurs in close proximity to the victim, some of the victim’s fluids, namely saliva or blood, can “blow back” onto the gun, creating a DNA match. She testified that “blow back” is not unusual. She also testified that while it is possible for an individual to transfer DNA even while wearing gloves, the chances of this are diminished.
Brown also testified to testing samples of the blood from inside 7201 Suntan Street, the home where Tori Cason and Isaiah Turner were located after the shooting. She testified that Trammell could not be excluded from matching the blood found near the door as well as on the bloody shirt.

Carla White

Carla White, a forensic scientist specializing in firearms identification at the North Louisiana Crime Lab, was qualified as an expert in her field. White testified that she was responsible for processing the firearm associated with this case. She stated she test-fired the weapon and concluded it worked. She stated she then used the cartridge from the test-fire to compare to the cartridge found at the scene of the crime. After comparing the two, she testified, she determined that the cartridge found at the scene was fired from that gun.
She also testified as to the safety mechanisms built into a Glock, the type of gun associated with the shooting. She stated there are three |22mechanisms that must be engaged in order for a Glock to be fired. She stated that these safety mechanisms prevent a gun from being fired if hit or dropped. After the safety mechanisms are engaged, in order for someone to pull the trigger on that particular weapon, she testified, seven pounds of pressure would have to be applied to the trigger as well.

Luden Trammell

The defendant, Lucien Trammell, took the stand to testify on his own behalf. He stated that on the day of the shooting he was at his girlfriend’s house at 7121 Suntan Street. According to Trammell, he walked to the store and on his way back he noticed Keldrick Cornelius pointing behind him to indicate that a patrol car was behind him. He stated he was walking on the side of the street and he looked behind him and saw the police vehicle but continued walking.
Trammell testified that the patrol car pulled up beside him and stopped as the officer in the vehicle called for him to come to the vehicle. Trammell stated he stopped, but did not approach the vehicle. *217 Then, he testified, the officer grabbed him and pulled him. Trammell claimed that the officer’s actions “spooked” him and he pulled away. The officer grabbed him again, he stated, and the two began to “tussle.” Trammell testified that he told the officer to let him put his CD player down, but the officer would not let him. Trammell testified that the “tussling” continued as the officer tried to slam him on the hood of the car. Trammell admitted that he had a gun in his pocket at this time and explained that his reason for carrying a weapon was because some people had shot at him a couple of weeks prior. |g¡He admitted that he had two prior felony convictions and it was illegal for him to be in possession of a firearm. According to Trammell, he stole the gun from his brother’s car.
Trammell explained that he did not know how the gun came out during the altercation, but once it did, the officer grabbed it and they continued to “tussle.” Trammell testified he then told the officer to give him the gun twice and when he tried to pull for it, the gun went off and he saw the officer grab his face. He then stated he took off running and dropped the gun along the way. He testified he arrived at Cornelius’s house, jumped the back fence, and started beating on the windows and shouting Cornelius’s name. While he was beating on the windows, one of them broke and the glass fell on him. When Isaiah Turner came to the room he opened the back door and let him inside. Trammell stated he did not force his way into the home, but was let inside by Turner.
Trammell testified that once inside he took off his clothes, wrapped the cut on his arm, and changed his clothes. Trammell denied speaking to Tori Cason although he admitted she was present, and stated he told Turner that he had been tussling with the officer when the gun went off. Tram-mell stated that an officer came to the house to request Cornelius’s identification because he was being taken into the station for questioning. Trammell testified he told Turner that the officers could not do anything to Cornelius because he had not done anything.
Trammell testified that he left the house and was stopped by an officer. He stated he gave the officer his identification but did not disclose |24his involvement in the shooting because he was scared. He explained he continued walking until he came across an acquaintance named Sam who gave him a ride to the Circle K. At the Circle K, he stated, he saw a friend named Bravo who was driving to Texas to “take care of some business.” Trammell testified, he decided to ride with him to Texas. The pair ended up near Humble, Texas.
At some point, Lucien Trammell spoke to his brother, Henry Trammell. Henry told Lucien that he was on the news because of the shooting of a police officer. Lucien testified he asked his brother to bring him some money, but before he could do that the detectives were calling Henry to find out where Lucien was located. The defendant stated he was planning on turning himself in because he feared he would get killed if he got stopped by the police. He testified his brother told him that Det. Demery was “cool” so Lucien told the detective some information, but not everything because he did not trust him yet. Lucien admitted he lied to Det. Demery when he told him he heard shots being fired as he ran away. He testified he told a different officer his location at that time, as well as a description of what he was wearing so he could get picked up by the police and turn himself in. Tram-mell claimed he never desired to shoot the officer with the gun, and reasoned that if he had really wanted to kill the officer it *218 would have been evident, because he would have shot him multiple times instead of just once. He also stated the reason he resisted when he was first stopped by the officer was because he had a weapon on him illegally as well as a small amount of marijuana. Trammell testified that he did not stay and l^try to help the officer after he realized he had been shot, because he knew the officer had already called for backup and it would be impossible to explain the circumstances of the officer being shot while he was holding a gun.

Weighing the Evidence

In order for the state to prove its case, it had to show that Trammell had specific intent to kill Off. Madjerick who was engaged in the performance of his duties. Considering the evidence presented during the trial, both direct and circumstantial, in the light most favorable to the state, it was clearly sufficient to convict Trammell of the charged offense of attempted first degree murder.
Trammell admitted that he struggled with Off. Madjerick and that Off. Madjer-ick was shot. However, he claims he did not intentionally shoot the officer, but instead the officer accidentally shot himself during the struggle. The state provided testimony from Carla White, a forensic scientist specializing in firearms identification at the North Louisiana Crime Lab, that it was improbable that the gun used in the shooting could have been accidentally fired, as Trammell claimed, because of the three safety features as well as the amount of pressure needed to discharge it. Further, although Off. Madjerick was not able to recall every detail of the shooting, he did recall that there was-a struggle with Trammell during which Trammell held a dark object in his hand and pointed it at his face. He also recalled Trammell demanding the officer’s gun before feeling a tingling sensation in his body. This testimony was corroborated by Cornelius when |2fihe stated that he, too, observed Tram-mell struggle with the officer before demanding the officer’s weapon, and ultimately shooting him in the face. While the state provided ample evidence that the shooting was intentional, there is nothing other than the defendant’s own self-serving testimony that would support the defendant’s theory that the shooting was accidental. The trier of fact in this case, namely the jury, was charged with the task of determining whether Trammell had the requisite intent to kill the officer. After a thorough review of the record in the light most favorable to the state, it is abundantly clear that the state met its burden of proving that Trammell did in fact intend to kill Off. Madjerick.
Defense counsel thoroughly cross-examined all witnesses and highlighted any alleged inconsistencies. The inconsistencies noted by the defense did not amount to drastic changes in testimony, but were more evident of slight differences in the ways in which questions were asked and answered. The witnesses consistently provided testimony that indicated Trammell was the shooter and had the intent to kill Off. Madjerick when he shot him. The jury apparently chose to believe the testimony of these witnesses and there is nothing in the record that warrants this court’s reversal of the jury’s determinations. This assignment of error is without merit.

Error Patent Review

Pursuant to La. C. Cr. P. art. 920, we have examined the record and we note the presence of one error patent. Following his adjudication as a third felony offender, the defendant was sentenced to serve 58 years ofj^imprisonment at hard labor, without the benefits of probation or suspension of sentence. However, the defendant’s sentence should have also been *219 imposed without the benefit of parole. Louisiana R.S. 14:27 D(l)(b) provides:
If the offense so attempted is punishable by death or life imprisonment and is attempted against an individual who is a peace officer engaged in the performance of his lawful duty, he shall be imprisoned at hard labor for not less than 20 nor more than fifty years without benefit of parole, probation, or suspension of sentence, (emphasis added)
Additionally, La. R.S. 15:574.4 A(1) provides, in part, “A person convicted of a third or subsequent felony offense shall not be eligible for parole.” The trial court’s failure to state that this sentence should be served without benefits will be automatically corrected by operation of La. R.S. 15:301.1, which provides, in pertinent part:
The failure of a sentencing court to specifically state that all or a portion of the sentence is to be served without benefit of probation, parole, or suspension of sentence shall not in any way affect the statutory requirement that all or a portion of the sentence be served without benefit of probation, parole or suspension of sentence.
When a district court fails to order statutorily mandated service of sentence without benefits, the sentence will automatically be served without benefits for the required time period. See State v. Williams, 2000-1725 (La.11/28/01), 800 So.2d 790. Consequently, we order that the sentence of 58 years be served at hard labor, without benefit of probation, parole, or suspension of sentence. We further order that the trial court minutes be amended to reflect this adjustment of defendant’s sentence.
| ^Conclusion
For the foregoing reasons, the conviction of Lucien Jamar Trammell is affirmed. His sentence is amended, and as amended, is affirmed.
AMENDED, AS AMENDED, AFFIRMED.

. This video and audio recording would be played for the jury several times throughout the trial.

. This partial playing and partial reading of the recorded conversation was done in an effort to redact parts of the conversation regarding drug possession that could have been prejudicial to the defendant if disclosed to the jury.