BROWN, Chief Judge.
[ 1A jury in a 10-2 vote convicted defendant, Joe Lee Grady, Jr., of the September 4, 2005, second degree murders of his girlfriend, Echo Washington, and Arthur Tyson, Jr.[1] Both of the victims were killed in a trailer house fire in Vivian, Louisiana. Defendant appealed urging that the evidence was insufficient to prove that he was the perpetrator of the crimes, and, in the alternative, that the evidence proved that he committed only manslaughter rather than second degree murder.[2] Tied to the sufficiency of the evidence argument are questions about the admissibility of certain evidence and in particular, defendant’s confession. Following a denial of motions for new trial and for post verdict judgment of acquittal, defendant waived the sentence delay, and the trial court imposed concurrent mandatory sentences of life imprisonment at hard labor without benefit of parole on each of the two counts. We affirm.

Discussion

Denial of Motion to Suppress/Motion for New Trial

On the night of Saturday, September 3, 2005, Arthur Tyson, Echo Washington, Ze-phinah (“Zeph”) and Echo’s teenaged brother James Washington were gathered at Echo’s trailer home. Zeph was Echo’s child by Tyson; however, at the time Tyson was living with Shantae McCauley who also had a son fathered by Tyson. James intended to spend the night at the trailer and arrived before midnight. James said that Tyson and Echo |2were in the back bedroom, and he and Zeph were in the living room watching television. Sometime after midnight, defendant, Joe Grady, arrived at the trailer to get a DVD/VCR combination player that belonged to him. He got the player and left; however, he returned and asked James to go get his cell phone from Echo, who was still in the back bedroom with Tyson. Echo came out and personally gave the phone to defendant. James could not overhear their words or the tone of their voices during their conversation. After getting his phone, defendant left the trailer.
Vivian police received a 911 call at approximately 3:45 a.m.; Vivian Police Officer Bobby Smith and another officer were the first to arrive at the scene; the trailer was fully engulfed in flames. Officer Smith saw James Washington in the front yard and saw Zeph a little later. James told Officer Smith that Tyson and Echo were unaccounted for. Zeph was taken to a nearby hospital and then transferred to LSU-HSC by air ambulance; he suffered terrible burns that required skin grafts and also lost his voice due to his injuries. The fire department arrived and fought the fire for about one hour. When the fire was extinguished, the burned bodies of Tyson and Echo were located; Tyson was in the back bedroom, and Echo was in the hallway. Coroner Todd Thoma testified that the cause of death for both victims was smoke inhalation and/or burns as a result of the fire.
Officer Smith, along with Vivian Police Department Sergeant Ryan Nelson and James Alexander and Rick Abbott of the State Fire Marshal’s Office investigated the fire. Investigator Alexander examined the mobile home and smelled something similar to gasoline. Alexander noted that lathere had been considerable damage to the trailer resulting in a total loss. He *849 observed heavy damage to the living room, as well as extensive fire venting out the front and rear doors and above the front living room window. Alexander concluded that the fire had been deliberately set at the utility hallway near the back door of the trailer; a sample of the linoleum in that area tested positive for the presence of gasoline.
Initially, defendant, who was a boyfriend of Echo Washington, told the investigators that he had been to Echo Washington’s home late Saturday night to retrieve his cell phone but that he left and was back at his house by about 12:30 a.m. Sunday morning; he said that he did not leave his home after that time.
After receiving conflicting information from other witnesses, defendant was interviewed a second time. He was thoroughly advised of his Miranda rights. The recording of this second interview was incomplete; the investigators reported that the recorder did not beep when the tape ended so the last part of the interview was not recorded. According to Investigator James Alexander, during the unrecorded portion of the interview, defendant finally admitted to setting the fire and agreed to accompany the investigators to the scene of the fire. Alexander said that after defendant had repeatedly denied setting the fire, “all of a sudden, Joe just put his head down and in a low voice said T did it.’ ”
At that point, Alexander, Officer Bobby Smith and defendant went to the scene. Defendant rode with Officer Smith. Alexander explained that when they arrived, defendant went to the middle bedroom window, raised it, 14and “demonstrated how he set a rag on fire and put it on the bed.” Alexander shined a light on the bed and the bed was not burned. Alexander testified that he told defendant, “if the bed, this is where you threw the rag how come the bed is not burned?” Defendant said he threw the rag into the room past the bed toward the door of the room. They showed defendant that there was no rag and that the carpet had not been burned in the room. Alexander then said:
Well, at that point, Joe on his own initiative walked from the doorway to that bedroom to the rear door of the mobile home which was about three or four steps. He walked out, he walked through the door, out onto the back porch and turned around facing the mobile home. He took one of his legs, he extended it into the doorway over the threshold, and he moved it side by side, and he said, this is where I set the fire.
Alexander also testified:
So I asked Joe to show me how he set the fire. Joe indicated that he pulled the screen door open about a foot, and at that point, I said, what screen door, because there was no screen door there. Joe stepped off the porch and reached down and there was a big pile of debris and there was a part of a screen door that was sticking out of the debris, and he reached up and grabbed part of the door, and he said, this, this is the screen door. So I said, okay. So he gets back up on the porch, and he said he reached in and stuck his hand in the hole for a doorknob and opened the wooden door about a foot. And I asked him to show me how, demonstrate how he poured the gas, and from standing on the porch outside the doorway he reached in with his hand and demonstrated pouring the gas on the floor just inside the doorway. Then I asked Joe to show me how he ignited the gas, and he demonstrated by bending down with his cigarette lighter in his hand, reaching in, lighting the fuel, and pulling his hand back fast. And he said the gas, it ignited, it did not flash up. I asked him if he shut the *850 door back and said no, he left it open about a foot.
No audio or videotape recording was made of these events at the scene.
| fiAfter the investigators took defendant to the scene, they returned to the police station and Alexander took another statement from defendant. He was again read his Miranda rights, and this interview was recorded in its entirety. In this interview, defendant explained that when he retrieved his phone from Echo at midnight, she told him that she would come to his house when Tyson left at about 3:00 a.m. Defendant said that he went home and went to bed, but when he awoke at 3:00 a.m., he realized that Echo was not there. He said that he got up, got dressed, and walked toward Echo’s house. Defendant explained that he met Jerome Russell outside and spoke with him, and that Russell then left. Defendant said that he continued on to Echo’s trailer. He saw that there were lights on in the front room of the trailer, and he saw a red gas can in front of a storage building on the property.
Defendant said that when he saw the gas can, the idea came to him to start the fire, so he went around to the back of the trailer, opened the door and sprinkled the gas there. He said that there was no door knob on the door and that he just pulled it open “enough to put my hand in there and spray a little gas.” Defendant said that he then took his cigarette lighter and lit the fire; he said that “it wasn’t no boom or all that” and that the fire didn’t flash. He said that he then walked back home the way he came, stood outside and looked back and did not see any flames, so he went inside and got into bed. He explained that his intent in setting the fire was to scare Echo Washington and that he thought that James Washington and Zeph had already left the trailer.
[(¡Defendant’s confession was subject to two separate motions to suppress filed in the trial court. The first motion provoked an extensive hearing before a different judge and was denied. The second, citing additional reasons, was heard by the trial judge and was likewise denied. On appeal, defendant argues that the trial court erred in denying his motion for new trial on this basis as well. Defendant’s arguments span both his Miranda waiver and the voluntariness of his confession.
Before a criminal defendant’s confession may be admitted into evidence, the State has the burden of proving beyond a reasonable doubt that the confession was freely and voluntarily made. State v. Green, 94-0887 (La.05/22/95), 655 So.2d 272. In addition, a suspect must be informed of and waive his Miranda rights. Id.
Regarding the knowing and intelligent waiver of a defendant’s Miranda rights, our supreme court in State v. Green, 655 So.2d at 280 wrote:
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), re’hg denied, 385 U.S. 890, 87 S.Ct. 11, 17 L.Ed.2d 121 (1966), the United States Supreme Court declared that a condition precedent to obtaining a statement admissible in court from a suspect in police custody is that the suspect be informed that he has the right to remain silent and to consult with an attorney. Miranda also made it clear that for such a statement to be admissible it must be made with a knowing and intelligent waiver of those rights. Miranda, supra, at 475, 86 S.Ct. at 1602. In other words, for a statement which is the product of custodial interrogation to be entered into evidence against a criminal defendant, at the time the statement is made the defendant must understand that he is entitled to certain protections under *851 the law and nevertheless decide to speak.
When, as in this case, a defendant has expressly waived his Miranda rights, the question becomes “whether the purported waiver was 17knowing and intelligent ... under the totality of the circumstances.” [State v.] Abadie, supra, 612 So.2d [1] at 5 [ (La.1993) ], quoting Oregon v. Bradshaw, 462 U.S. 1039, 1044-46, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983).
Moderate mental retardation and low intelligence or illiteracy do not of themselves vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession. State v. Anderson, 379 So.2d 735 (La.1980). See also State v. Tart, 93-0772 (La.02/09/96), 672 So.2d 116, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996); State v. Benoit, 440 So.2d 129 (La.1983). The critical factor is whether defendant was able to understand the rights to remain silent and to consult with an attorney.
A psychiatrist, George Seiden, M.D., conducted a sanity evaluation of defendant in 2008. As for the ability of defendant to understand his rights under Miranda, Dr. Seiden said at the 2008 hearing on the motion to suppress that:
Based on my evaluation, which included the interview I did of [defendant] for the Court-ordered competency evaluation, as well as the review of a variety of documents, some of which had been included when I did my evaluation for the Court and some of which I was provided subsequent to that, it’s my opinion that he does suffer from mild mental retardation; but, despite that, he was capable of understanding his Miranda rights. He was capable of giving a knowing and voluntary confession. So that’s my opinion.
Although Dr. Seiden said that he was evaluating defendant for his competence to stand trial and not for his ability to understand his rights at the time he originally interviewed him, he explained that he was able to make that determination retrospectively based upon the interview and other information. Dr. Seiden noted that when he did his evaluation, he had | «defendant sign a consent form, and as to that form, “... [defendant] knew that he had the right not to say anything. He said that himself.”
At trial, Dr. Seiden again opined that defendant was probably mildly mentally retarded. Even so, after listening to the recording of defendant’s confession, Dr. Seiden believed that the confession did not fit the criteria that is typically found in false or coerced confessions. Dr. Seiden explained that despite the aggressive manner used by the investigators, defendant continued to resist confessing and denied involvement. Further, in the second statement, after he returned from the scene, defendant was able to provide information that only he would have known and was not simply “parroting” information that was told to him. Dr. Seiden reviewed numerous details in defendant’s statement that were in the form of a narrative by him that were consistent with his confession being true and not coerced or false. At trial, however, Dr. Seiden backed off of his positive statement concerning defendant’s understanding of the Miranda warnings. He said that an opinion about defendant’s ability to understand the Miranda warnings would be speculative in the absence of a specific evaluation which he had not performed and which, to his knowledge, had not been done in this case. On cross-examination, Dr. Seiden said that he was unaware of the break in the tape recording *852 and had a concern about the effect of the police questioning, saying:
Well, I would want more information. If that were in isolation, I would say yes, were it not followed by the parts of the interrogation in his confession that I have gone through and read to the jury.
IflUltimately, Dr. Seiden concluded that, although people with mild mental retardation can be coerced into a confession, defendant was not.
Defendant’s witness at the suppression hearing and trial was a psychologist, Dr. Webb Sentell. Dr. Sentell administered an intelligence test to defendant, whose full scale IQ was measured at 67. Dr. Sentell said that this measurement put defendant in the category of mildly mentally retarded. He believed that a person in this category would have difficulty understanding his Miranda rights and that his understanding would be “marginally competent.” Dr. Sentell also listened to the recording of the interviews with defendant; he described the officers as “pretty aggressive and coercive” and stated that mentally retarded individuals are much easier to coerce than normal individuals. Dr. Sentell opined that “in Mr. Grady’s ease, he was coerced in my opinion, and, of course, he was compliant in that he confessed.” Dr. Sentell also found it significant that at the crime scene defendant told “the wrong story” the first two times he described setting the fire.
Interestingly, Dr. Sentell’s opinion was also modified at trial. At the first suppression hearing, Dr. Sentell answered “No,” when asked if defendant had an understanding of what Miranda rights were. However, at trial, Dr. Sentell said, “If I had to fall off the fence I would say that’s why we’re — yes, if we have to say yes or no is he competent, marginally competent means competent.”
The inquiry about a defendant’s ability to understand Miranda is not limited to expert opinion. Courts are able to consider many sources of | ^information, not only expert testimony, in making the determination as to whether a mildly mentally retarded person is capable of understanding and waiving the Miranda rights. For example, testimony from the interviewing government agents is evidence that may help satisfy the burden of proving understanding. The supreme court in State v. Green, supra at 282-83 stated:
We find that the State met its burden of proof in this case. The trial judge evidently credited the testimony of the police officers, in particular their experienced opinion that Green knew what he was doing when he waived his rights and started to speak.
Both of the trial judges who considered this issue had the benefit of reviewing the two audio recordings of defendant’s confession. At the beginning of the first interview, defendant’s responses are minimal. However, his answers become more audible throughout the interview. As noted above, the expert opinions were, at best, mixed on the issue of defendant’s capacity to understand and waive his Miranda rights. The officers testified that they were convinced that defendant understood his rights and chose to waive them. In the second recorded interview, defendant accurately recalled specific details as well as attempted to manipulate a more favorable view of himself by saying that he only wanted to scare the victims and that he believed the child and James were not in the home.
After considering all of the evidence in this record, we tend to agree with Dr. Sentell’s last statements about the issue— that defendant was minimally competent to understand and waive his Miranda rights. Dr. [nSeiden’s neutrality from his earlier *853 opinion gives us cause for concern, but ultimately, defendant’s statement as a whole demonstrates his understanding of what was going on. Although it is a very close call, we find that the two lower court judges’ conclusions that defendant understood and waived his Miranda rights is supported by the entire record. See State v. Collins, 370 So.2d 533, 538-9 (La.1979) (“The issue is a close one.... The substantial evidence of defendant’s mental retardation and incapacity raises a serious question also to whether defendant could have knowingly and intelligently waived his rights.... After considering the evidence carefully in this case, we cannot say that the trial judge abused his great discretion in concluding that the state presented requisite proof of a knowing and intelligent waiver of rights by the defendant.”).
As to the free and voluntary issue, the recording of the first interview with defendant shows that Alexander and Richard Abbott were questioning defendant very intensely, with Abbott being aggressive and Alexander being more calm and sympathetic.
Investigator Richard Abbott explained his role in the questioning of defendant; he said that he was trying to antagonize defendant so he would bond with Alexander and tell him the truth. Abbott told defendant that he would face the death penalty if he were convicted of first degree murder and cursed loudly several times. At the scene, defendant originally showed them that he had thrown a gasoline-soaked rag through a window, but the fire damage was not consistent with that. Defendant then said that he had actually set the fire in the front bedroom where the children were; again, the 112fire damage was inconsistent with this assertion. Alexander confirmed that defendant finally showed the investigators that he started the fire in the back hallway by pouring gas on the floor through the back door.
Bobby Smith of the Vivian Police Department also sat in on the interviews with defendant and affirmed that defendant was not threatened or promised anything in exchange for his confession. Smith took defendant to and from the crime scene and said that they had no conversation at all during the drive. Officer Ryan Nelson likewise sat in on the interviews and confirmed that the investigators never threatened defendant or promised him anything in exchange for his confession. Nelson said that he had known defendant since middle school and had no knowledge that he was retarded or mentally slow, although Nelson said that he was surprised when defendant admitted to the crime because “by me knowing Joe I wouldn’t have thought he would do anything like that.”
Considering all the testimony, we can not say that the trial court erred in finding that defendant’s confession was freely and voluntarily made, but this too is a close issue given what, frankly, was an unacceptable procedure in the taking of his statement. Unfortunately, a critical part of the statement — where defendant initially admits his culpability — is missing. The trial court was forced to make its decision about the voluntariness of the confession based upon the testimony of the investigators rather than upon a complete record of what happened during the interview. As for the investigators’ aggressive questioning, while the interviewers did not make any overt threats or blatantly coerce defendant, they were borderline | ^inappropriate in their tactics and at one point, misstated the elements of first degree murder to defendant when they told him they could convict him even if he had no intent but acted “accidentally.” Notwithstanding this, defendant maintained his innocence for some time despite warn *854 ings that he might “lose [his] life with a needle in [his] arm in Angola.”
Both the Miranda issue and the voluntary issue are close but, we find that the trial court did not violate its strong discretion in deciding that the confession was admissible.

Sufficiency of the Evidence

Defendant’s argument in this assignment of error is multifaceted, but essentially he argues that the evidence was insufficient to prove that he was the perpetrator of the offenses and, in the alternative, that the evidence proves that he committed only manslaughter rather than second degree murder.
La. R.S. 14:30.1 provides:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of ... aggravated arson ... even though he has no intent to kill or to inflict great bodily harm.
La. R.S. 14:51 provides, in part:
Aggravated arson is the intentional damaging by any explosive substance or the setting fire to any structure, watercraft, or movable whereby it is foreseeable that human life might be endangered.
114The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.05/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.02/22/06), 922 So.2d 517. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.02/25/09), 3 So.3d 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913.
Defendant lived in the neighborhood at 1502 South Pardue Avenue. There was a dirt road behind Seminole Street that people, including defendant and Echo, used as a path between South Pardue Avenue and Echo’s trailer.
The events happened late Saturday night/early Sunday morning and many residents of the neighborhood were either coming home from a club in nearby Rodes-sa called the Bird’s Nest or in their yard socializing. Portia Ashley testified that on the morning of the fire, between 3:00 and 3:30 a.m., |1sshe was coming home from the Bird’s Nest and saw defendant leave his house alone, walking in the direction of Echo’s trailer. Rashonda Miller lived at 1506 South Pardue near defendant’s home. On the morning of the fire, Ms. Miller said that she left the Bird’s Nest around 2:15 or 2:25 a.m., drove back to Vivian, went to a convenience store, and then returned to her home. When she got there, she and a friend, Jesse Douglas, sat visiting under her carport, which faces South Pardue. About 45 minutes after Ms. Miller got home, she saw defendant leave his home and walk down the dirt path in the direction of Echo’s trailer. About 10 or 15 *855 minutes later, she saw defendant come back down the trail from the direction of the trailer and go back to his house. She then saw defendant come back out of his house with a can of beer or soda in his hand and go back down the path towards Echo Washington’s trailer. She did not see him return; not long after Ms. Miller saw defendant that second time, Douglas left and she went inside her home. Ms. Miller did not hear an explosion, but learned about the fire the next day. Douglas’s testimony was the same as Ms. Miller’s.
Jerome Russell, who lived at 306 Seminole Street three houses down the street from Echo Washington,[3] was also awake and in his yard at about 3:00 a.m. that morning. Russell was rolling a marijuana cigarette in his back yard when he saw defendant walking up the road with a beer and a cigarette in his hands. Russell, who knew defendant, spoke to him. Defendant then told Russell that he was going home, and he walked away back toward his home on South Pardue. However, about 10 or 15 minutes |1filater, defendant came back and again spoke to Russell. At that time, Russell went across the street to a party. He did not see defendant again.
Investigators also learned that defendant and Arthur Tyson, Jr., had previously been involved in a violent encounter. Kara Killian, who lived in Vivian, testified that she witnessed a fight between the two men on November 3, 2004, and Tyson was “beating the other one (defendant) up really bad.” She said that Arthur Tyson was “stomping and kicking” defendant while Shantae McCauley watched.
Vivian Police Department Officer Shawn Channelle responded to a 911 call regarding the fight. He found defendant lying unconscious in the street with “severe head wounds covered in blood.” Defendant had to be hospitalized, and Tyson was later arrested for battery.
Although the fire occurred between 3:00 a.m. and 4:00 a.m., there were an unusual number of witnesses available to testify about the whereabouts and actions of the various parties in this case. Many of these persons saw defendant on his way to, or very close to, the site of the fire at 312 Seminole shortly before the fire occurred. The evidence from the fire investigators also established that the fire was not an accident but instead was deliberately set with the aid of an accelerant. Further, there was ample evidence of a motive for defendant to commit the crimes; he was seriously beaten by Tyson in a previous altercation, and his girlfriend was getting back together with Tyson. Then, there was defendant’s confession. He said he did it. He showed the officers how he did it. He confessed that he only meant to “scare” Echo Washington.
117Pefendant presented witnesses that indicated that there was bad blood between Shantae McCauley and Echo Washington. Jessica Sanders, who was 14 years old at the time of the fire, testified that on Saturday, September 3, 2005, she was at Shantae McCauley’s house playing a computer game when she witnessed an argument between Shantae and Arthur Tyson. Ms. Sanders said:
But when Arthur came out the house, they continued to argue as he walked up the street, and Shantae yelled out to Arthur and was like, he better not be going over to Echo house, she tired of this, if she catch them together she *856 would kill them because she tired of it, and Arthur kept walking.
Billy Washington, Echo’s brother, testified that he had seen a fight between Echo and Shantae “a couple of months” before the fire, started by Shantae over Echo’s relationship with Tyson. On cross-examination, Washington said, “[Echo] told me that she told Joe [Grady] that she was in love with [Arthur] and she wanted to get back with her baby daddy. That’s what she told me.”
A number of witnesses testified to seeing or being with Shantae McCauley throughout that Saturday night/Sunday morning. A surveillance video at an E-Z Mart store shows McCauley’s presence at 3:45 a.m. on the morning of the fire. Although there was evidence that Shantae McCauley had a motive to commit these offenses, defendant admitted that he was the person who committed the offenses. The evidence is thus sufficient to prove that defendant committed the second degree murder of both victims by virtue of his commission of aggravated arson.
| ^Defendant also argues that the evidence supports, at most, verdicts of manslaughter, which is defined, in relevant part, as a “homicide which would be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.” La. R.S. 14:31(A)(1); State v. Quiambao, 36,587 (La.App.2d Cir.12/11/02), 833 So.2d 1103, writ denied, 03-0477 (La.05/16/03), 843 So.2d 1130. Having found sufficient evidence to prove beyond a reasonable doubt second degree murder, this argument is moot.
However, the jury was fully within its province to reject the idea that defendant was acting under sudden passion or heat of blood caused by the events of the previous day.

Introduction of Motive Evidence

Defendant argues that the trial court should not have allowed, over his objection, evidence that Arthur Tyson badly beat him in a fight several months prior to the fire.. He cites La. C.E. art. 404(B), the prohibition against certain other crimes evidence, in support. However, the fight did not demonstrate any bad act or other crime by defendant; the wrongful actor was apparently Arthur Tyson, who beat defendant unconscious. This was evidence that was highly relevant to proof of defendant’s motive to commit the crimes, which in this case was relevant to proof that defendant was the person who committed the crimes.
| introduction of Photographs of Victims
Defendant argues that the trial court should not have allowed the jury to see four photos of the victims’ burned bodies because these photos were gruesome and more prejudicial than probative.
None of these photos are so gruesome that they would overcome a juror’s reason and lead them to convict in the absence of other evidence. State v. Broaden, 99-2124 (La.02/21/01), 780 So.2d 349, 364, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001). The photos were relevant in that they all show the positions of the bodies in the trailer from various angles and the damage to the trailer — and the victims — caused by the fire in these areas. Id.

Limitation of Re-cross Examination

During the testimony of Summer White, a prosecution witness, the prosecutor and defense counsel asked Ms. White about her whereabouts during the early morning *857 hours of September 4, 2005. On redirect, the prosecutor got the witness to clarify where she and Shantae McCauley had walked and then where they drove with their friends. At the conclusion of redirect, defendant asked to re-cross examine Ms. White, but the court refused to allow re-cross.
During the testimony of fire investigator James Alexander, a prosecution witness, the prosecutor and defense counsel covered a wide variety of topics concerning the fire investigation and the interview with defendant. On redirect, Alexander was asked about defendant’s claim that there was no “whoosh” or explosion when he lit the gas, and Alexander [2nopined that, based on his experience, he thought defendant was lying about that and that defendant was lying when he said he thought the fire had gone out in his statement.
Defense counsel asked to recross the witness about the “whoosh” on a gas fire and if the fire could go out, and the court found that the issue was amply covered on direct and cross examination already, so the court denied defendant the opportunity to re-cross Alexander.
The Sixth Amendment to the United States Constitution and La. Const. Art. 1, § 16, guarantee an accused in a criminal prosecution the right to be confronted with the witnesses against him. La. C.E. art. 611(B) provides that a witness may be cross examined on any matter relevant to any issue in the case. It has long been the rule that permitting re-cross examination is in the sound discretion of the trial judge and in the absence of some showing of an abuse of that discretion, and resulting prejudice, his ruling will not be disturbed on appeal. State v. Cordier, 297 So.2d 181 (La.1974). Further, confrontation errors are subject to the harmless error analysis; the verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial was surely unattributable to the error. State v. Broadway, 96-2659 (La.10/19/99), 753 So.2d 801, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000).
A review of the lengthy testimony of both of these witnesses reveals that the error, if any, was harmless. Ms. White was questioned at great length and in substantial detail about her and Shantae’s whereabouts on the evening of the fire, and defendant had ample opportunity to explore those ^issues on cross examination. As for Alexander, the nature of the gasoline-fueled fire had also been explored at length during his testimony, and there was no significant prejudice to defendant by refusing further examination after the witness gave his opinion about the likelihood of the fire going out once ignited.

Leading Questions by State during Direct Examination

Defendant argues that the trial court should not have allowed the state to lead its witness, Tawana York, on direct examination. Ms. York was the clerk of the EZ-Mart who testified about Shantae McCauley’s presence in the store at 3:45 a.m. the morning of the fire and who also testified about the error in the time displayed on the store’s surveillance video. Ms. York was confused during her testimony about the time error, stating at first that the time displayed was an hour behind, and confirming that on a video with a time stamp of 2:42, but then when shown a video with a time stamp of 4:44, the witness said, “I know it was an hour off is all.” The prosecutor then asked, “Could it be that it was an hour ahead, so that where it shows 4:45 ...” and defendant objected to the prosecutor leading the witness. The trial court overruled the objec *858 tion, but the prosecutor did not immediately go back to questions about the time stamp. Later, the prosecutor asked Ms. York whether she was unsure about whether the clock was an hour behind or an hour ahead, and the witness repeated that she was sure that Shantae McCauley had been in the store at “3:00 something.”
Generally, leading questions should not be used on direct examination of a witness. La. C.E. Art. 611(C). Such questions, however, | ^are not the type of prosecutorial error which diminishes the reliability of a jury verdict. The use of leading questions is largely within the discretion of the trial court, and only clear abuse of that discretion which prejudices the defendant’s rights will justify reversal of a conviction. State v. Essex, 618 So.2d 659, 666 (La.App. 2d Cir.1993).
In this case the leading question was perfectly acceptable given the substantial confusion about the time stamps on the video and Ms. York’s recollection that the time was an hour off in one direction. The surveillance videos have times that are an hour before and an hour after the time the clerk recalled that Shantae McCauley was in the store, so the confusion about the time stamps was understandable, and defendant suffered no prejudice from the prosecutor’s effort to clarify the situation.

Rulings on Jury Instructions

According to defendant’s brief, defense counsel asked the trial court to include a jury instruction stating:
If you believe the defendant made a false confession, you are instructed to disregard the entirety of the defendant’s statements on September 7, 2005.
This exact instruction is not found at either of the pages cited by defendant, but evidently the language is fairly close to what was requested, as counsel stated “basically, it’s that if they find that it’s a false confession, then you are instructed to disregard it in its entirety.”
The requested instruction is simply not an accurate statement of the law. The jury is the finder of fact and if they concluded that defendant’s confession was false, they were entitled to give the other parts of his | ^.statement whatever weight they saw fit to give them; there is no requirement that they disregard the statement in its entirety. The requested instruction was not wholly correct; furthermore, the trial court covered the matter in the usual instruction:
If you find that the defendant made a statement, you must also determine the weight or value that the statement should be accorded, if any. In determining the weight or value to be accorded a statement made by a defendant, you should consider all the circumstances under which the statement was made. In making that determination, you should consider whether the statement was made freely and voluntarily, without the influence of fear, duress, threats, intimidations, inducement or promises.
Defendant also complains that trial court erred by giving the jury this instruction:
If you find that the defendant fled immediately after a crime was committed or after he was accused of a crime, the flight alone is not sufficient to prove that the defendant is guilty. However, flight may be considered, along with all other evidence. You must decide whether such flight was due to consciousness of guilt or to other reasons unrelated to guilt.
The court observed (outside the presence of the jury) that if the jury believed that defendant committed the crime, the evidence showed that he left the scene of the crime immediately after it was committed.
*859 The trial court was correct to give this instruction, as the evidence did indeed show that defendant left Echo Washington’s trailer after he set it on fire, and the jury was entitled to consider this evidence along with all of the other evidence of his guilt.

\9APenial of Continuance/Stay to Secure Witness’s Presence

In this assignment, defendant argues that the trial court mishandled the situation with Caroline Carter when the court refused to delay the trial further to secure her presence.
Caroline Carter had been subpoenaed to appear earlier in the trial, and had in fact appeared, but did not show up on the day that her testimony was required. Typically, a trial court should work to ensure that a defendant’s right to compulsory process is respected, and in the instant case, defendant was permitted to and did subpoena this witness, although the subpoena may not have reached her.
In this case, it appears that the trial court accepted the parties’ agreement that Caroline Carter could testify after defendant’s case had been rested, offered to issue a writ to bring Ms. Carter to court earlier in the day, and finally did delay the trial for at least 45 minutes to give the witness time to appear. The trial court only decided to conclude the case when it became apparent that no one knew the whereabouts of Ms. Carter or when she might be available to appear. Defense counsel objected to the court’s ruling and made a proffer of the police report. That proffer, D-6, consists of a discovery response from the state in August 2011 to which a Caddo Parish Sheriffs Office incident report is attached. In that report, Caroline Carter told a deputy that Shantae McCauley had threatened her by saying “she will burn all you m — f—ers up, just like I did those other two,” and “they (police) don’t know anything, if they did she would be in jail.” Further, even if the proffered evidence had been presented, there is essentially no ] ^likelihood that the jury would have reached a different result. Cf. State v. Green, 448 So.2d 782 (La.App. 2d Cir.1984). This assignment of error is without merit.

Conclusion

For the above reasons, defendant’s convictions and sentences are affirmed.
Affirmed.

. Defendant, Joe Lee Grady, Jr., was initially indicted for two counts of first degree murder, a violation of La. R.S. 14:30; the charges were later reduced to two counts of second degree murder, a violation of La. R.S. 14:30.1.

. The jury vote was 10 for guilty, one for manslaughter and one for not guilty.

. Specifically, Russell stated that Echo's trailer was behind the third house down the street from his mother’s house.