Judgment rendered July 17, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,702-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

DEWAYNE WILLIE WATKINS                       Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 362,447

Honorable John D. Mosely, Jr., Judge

* * * * *

LOUISIANA APPELLATE PROJECT            Counsel for Appellant
By: Sherry Watters

JAMES E. STEWART, SR.                  Counsel for Appellee
District Attorney

TOMMY JAN JOHNSON
WILLIAM JACOB EDWARDS
MEKISHA SMITH CREAL
Assistant District Attorneys

* * * * *

Before THOMPSON, MARCOTTE, and ELLENDER, JJ.

**ELLENDER, J.**

Dewayne Willie Watkins appeals his convictions and consecutive life sentences on two counts of noncapital first degree murder, arguing insufficient evidence to convict and to exclude the reasonable probability of misidentification, the improper admission of videotaped statements given by him in custody, the exclusion of an essential jury charge, and excessive sentences. For the reasons expressed, we affirm.

## FACTUAL BACKGROUND

The victims were Kelly Jose, an airman at Barksdale Air Force Base, and his wife, Heather Jose. On the evening of November 8, 2018, they took Kelly's two teenage children, Abby and Reagan, and Abby's then-boyfriend, Matt, to a pizza house for dinner and then to Mall St. Vincent, in Shreveport, to shop. As they were exiting the mall, around 8:30 pm, a Black man in a dark hoodie approached them and asked Heather if he could borrow her phone, as he was stranded and needed to call someone for a ride. Heather did not want to hand over her phone, but she offered to make the call for him; when she did, there was no answer. Heather was a part-time Lyft driver and wanted to help, so she offered to give him a ride to his destination. She and Kelly, along with the stranger, got into her white Kia Forte and rode off; the kids took Matt's truck to Kelly and Heather's apartment, on Fairfield Avenue, and waited.

However, Kelly and Heather did not return. Around 9:30 pm, Abby got a "ping" from Chase Bank advising that someone had withdrawn $800 from the joint account she held with Kelly and Heather. At this point, she

knew something was not right, and called the police to report the couple missing.

After 11:00 pm that night, residents of Penick Street, in the Queensborough neighborhood, were startled by the sound of a loud boom and, looking, saw a car in flames under the carport of a vacant trap house on the corner of Penick and San Jacinto Streets.[1]  They also saw someone in a dark jacket riding away on a bicycle, carrying a gas can.  They called the police, who came to the scene and made the gruesome discovery that the car was Heather's white Kia Forte and, inside, were the charred bodies of Kelly, in the front passenger seat, and Heather, in the driver seat.  Forensic analysis showed that each had been killed by a .22 bullet to the back of the head before the car was doused with flammable accelerant and torched.

Using information from Abby, Reagan, and Matt, detectives quickly secured surveillance videos from two stores at Mall St. Vincent, Elite Jewelry and The Foot Locker; they also got video from the Clark gas station a few blocks from the vacant house where the bodies were found.  A man matching the description of the person who approached the Joses and accepted a ride with them, and the man fleeing the site of the fire, was seen in the videos.  Detectives developed Watkins as a suspect and learned that he was staying at 3632 Penick St., about two blocks from the trap house.

Officers obtained an arrest warrant and, on the evening of November 10, assembled a SWAT team to surround the house and effect the arrest.  However, a standoff ensued.  When officers knocked, they heard scuffling and mad commotion inside; several minutes later, the tenant of the house,

---

[1] Some witnesses referred to this house, at 3458 Penick St., as a "trap house," a vacant or rundown house where people meet to deal and use drugs.

Shawanna Hughes, answered the door but refused to come out. In the ongoing commotion, officers saw someone punch a hole through the floor of the pier-and-beam house and put something into the wet soil beneath. Eventually, Shawanna and the other occupants exited, leaving just Watkins inside. Officers fired tear gas into the house, and, in a short time, Watkins climbed out a side window and ran. He clambered over a fence, ran into the next yard, and tried to hide in brush next to a fallen tree, but a police canine caught him, secured him by biting his right hand, and officers took him into custody. He was given medical attention for his hand and then taken to Shreveport Police Department for questioning.

Early that morning, Sgt. Angie Willhite and Detective Kenneth Thompson conducted a videotaped interview. Watkins told them his hand was hurting too bad for him to sign the *Miranda* form,[2] but they both saw he was able to use the hand to open a can of Sprite and drink it. He initially denied knowing anything about the burning car or even going to Mall St. Vincent the day before. However, after they confronted him with the videos from the mall, he admitted being there and catching a ride with Kelly and Heather. He said they dropped him off, that was the last he saw of them, and he had nothing to do with their murders. Instead, he blamed it on somebody named "Black," and said he was afraid of "Black."

Later, in January 2019, Watkins initiated an interview with Sgt. Willhite and Det. Thompson. In this interview, he admitted being at the mall and asking some people to borrow their phone; they called and got no answer, and then they gave him a ride to Shawanna's house on Penick St.

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

3

At that point, he insisted, somebody named "Tyron" hopped in the car and they drove off; Watkins never saw the couple again, and Tyron must have killed them. Tyron was later found to be another name for "Black."

## PROCEDURAL HISTORY; MOTION TO SUPPRESS

A Caddo Parish grand jury indicted Watkins on two counts of first degree murder in February 2019. The state filed notice of intent to seek the death penalty but dropped this intent in March 2021. Meanwhile, the Capital Defense Project assumed the case, filing numerous motions; of importance to this appeal are its November 2020 motions to suppress Watkins's two statements to police.

These motions came to a hearing over three days in November 2021 and January 2022. Det. Thompson and Sgt. Willhite testified that at the first interview, early in the morning of November 11, 2018, Watkins did not appear intoxicated or impaired, he seemed to understand his rights, and they used no threats, promises, etc., with him; however, after first denying anything to do with the incident, he changed his story once they said he could "get the needle." They admitted they did not read him his *Miranda* rights until several minutes into the interview. They also testified that Watkins himself initiated the second interview, on January 23, 2019, in which he laid the blame on "Black." The videos of the interviews were played for the court.

The defense's lead witness was Dr. John Sawyer, a neuropsychologist at Ochsner Health, in Shreveport, who performed a "Miranda Rights Competency Evaluation" on Watkins and found "significant limitations": an IQ of under 70, speech and language disabilities, and dependence on others for activities of daily life. He concluded Watkins was not competent to

4

waive his *Miranda* rights.  Still, he admitted the interrogations were not coercive, that some of Watkins's jailhouse communications were much more advanced than the testing would have suggested, and that prior experts had found evidence of malingering.

The state's expert, Dr. Todd Lobrano, a medical psychologist, did not personally examine Watkins, but reviewed Dr. Sawyer's report and the long list of psychological exams performed on Watkins over the years.  He found Watkins was feigning illness, had comprehension somewhat better than the IQ tests suggested, and understood the three prongs of *Miranda*.

The court ruled orally that the videos were the best evidence, and they showed Watkins's ability to understand and answer all questions, never asking for an explanation.  Although the timing was "questioned" by the defense, the court found the officers properly advised Watkins of the purpose of the interview and gave him his *Miranda* rights.  Further, Watkins "knew how to avoid answering questions," including those of Dr. Sawyer; the court discounted the expert's opinion that Watkins was simply incompetent to make a statement.  Finally, the officers' reference to "the needle" was not an undue influence and did not negate the free and voluntary nature of the statements.  The motions to suppress were denied.

**TRIAL EVIDENCE**

The matter proceeded to trial over 14 days in August and September 2022.  Kelly's daughter and son, Abby and Reagan, and Abby's then-boyfriend, Matt, positively identified Watkins as the person who approached them at Mall St. Vincent, asked to borrow their phone to call for a ride, and was then offered, and accepted, a ride with Heather and Kelly.  Other witnesses, not connected with the Joses, confirmed seeing Watkins at the

5

mall that afternoon, as did surveillance video from Elite Jewelry and Foot Locker. A video from the Chase Bank ATM on Greenwood Road showed Heather using her card to withdraw money, a person slumped over in the passenger seat of her car, and someone whose identity could not be discerned in the backseat. Surveillance video from the Clark gas station showed Watkins riding up on a bike later that night.

A large portion of the state's case described the situation at 3632 Penick St. on the evening of the arrest. Sgt. Eric Ardoin, of SPD, led the SWAT team surveilling the house for about an hour before Watkins drove up in a Pontiac G5 and entered. The team encircled the house and, when officers knocked on the door, two occupants, including Tyron "Black" Bates, exited, but the tenant, Shawanna Hughes, and her daughter, Karinity, would not. Officers negotiated for about an hour, during which they heard great commotion in the house and saw Watkins punch a hole in the floor and try to crawl out. Cpl. Gregory Gagneaux, of the SPD K-9 unit, was equipped with a body cam that recorded movement under the house; this was played for the jury and showed somebody placing something under the house before crawling back inside. Eventually, the women exited the house, officers lobbed tear gas into it, and Watkins crawled out a side window. He then fled from the house, hopped a fence, and was caught by K-9 "Geus" in debris near a fallen tree. Ofc. Peggy Elzie processed the scene, taking photos and gathering evidence. Notably, she found a hole punched in the floor of the house; under this, she seized a .22 caliber pistol, along with many live rounds of .22 ammo inside the house.

The occupants of the house also testified. Shawanna Hughes, the tenant, was in jail on a weapons charge at the time of trial. She testified

6

Watkins had come to stay with her a few weeks before the incident, and even got mail delivered there, but he never had any money. Shortly before the incident, Watkins told her somebody was coming over to sell him some dogs, and he was going to "take something" from people to pay for them; from this, she thought he needed money. The night of the incident, she heard the explosion a few blocks away; shortly after that, Watkins and Tyron came to her house, Watkins seeming nervous. Then, she gave Watkins some money to go to the store, and he left on someone else's (Eric Dorch's) bicycle. When the police pounded on her door, it was mass confusion, as everybody inside was trying to hide their drugs. She said the holes in the ceiling and floor were not there before the raid. She added that, shortly before trial, Watkins called her from jail to say the reason she was in jail was that "they" wanted her to testify against him.

Eric Dorch, who lives on SSI benefits and admitted being "a little slow," testified that he was also staying at Shawanna's house and had seen Watkins there with a .22 pistol. On the night of the incident, he rode there on a bike; Watkins told him he "got two dead peoples in the car" and wanted Dorch's help to drive them away, dump the bodies, and then clean up the car. When Dorch refused, Watkins took Dorch's bike to go to the store, carrying a jug "to get some gas." Dorch testified he saw the surveillance video from the Clark gas station and confirmed that it showed Watkins riding up on his (Dorch's) bike and putting gas in the container. When Watkins got back, Tyron told Watkins to get out of the house, because "you got a murder charge." Dorch testified that he saw "them people's phone" on the couch next to Watkins, and that Watkins later sold it to somebody called Bill Ester. Dorch added that he had his own phone with him at the house the

7

whole evening, and admitted he had previously told the defense he remembered nothing about the incident.

Karinity Hughes, Shawanna's daughter (and Watkins's cousin), testified that when police came to the house, it was a panic situation, with everyone trying to hide their drugs. Watkins was "suicidal," trying to hide in the ceiling and under the floor, and saying he needed to run. Kareem Hughes, Karinity's father, testified that he did not see Watkins break into the attic, but saw him fall out of it. Detrick Bates, Shawanna's son, testified that Watkins had come by earlier wearing a green hoodie, which he later put in the washing machine. The final occupant of the house, Tyron "Black" Bates, did not testify.

Two witnesses described Watkins's efforts to buy a dog. Bryan Adler, who was in jail on domestic abuse and child endangerment charges at the time of trial, testified that on November 7, he had some pit bull rescue puppies he wanted to sell. He drove to the Job Corps office to pick up his daughter, and Watkins walked up to ask about the dogs, saying he would get one once his girlfriend got home. They exchanged phone numbers and, later that afternoon, Watkins called. Adler and his daughter loaded up the puppies and drove to meet Watkins at a house on Penick Street. When they got there, however, Watkins's conduct was bizarre: he walked up to the side of the truck and tried to open the door. When Adler would not let him in, Watkins jumped into the bed of the truck, crossed to the other side, and then hopped out, walking away down the street. Watkins called Adler again, about 8:00 or 9:00 that night, asking Adler to meet him at a vacant house on San Jacinto Street. However, as Adler was driving up and keeping Watkins on the phone, Watkins grew suspicious that Adler might have somebody else

8

with him; at that point, Watkins "tripped" and told Adler he was running from the cops. The next day, Watkins called Adler about 2:00 or 3:00 pm to say he was stranded at Mall St. Vincent and needed a ride. By this point Adler wanted nothing more to do with the situation and told Watkins he had already sold all the puppies.

Adler's daughter, Tyler Denmon, confirmed that she rode with her dad to Penick Street that afternoon, where Watkins told them he wanted the puppies for his "homegirl," but he acted strangely. Further, she never saw any money or any girlfriend.

Forensics evidence showed that Kelly and Heather were each killed by a single .22 bullet to the back of the head. Carla White, a firearms examiner with the North La. Crime Lab, found that the bullet in Heather's body had been fired from the RG .22 seized under the house at 3632 Penick Street, and the bullet in Kelly's body could not be excluded as being fired from the same gun. Charles Menefee, a fire investigator with Shreveport Fire Department, testified the fire in the Kia started inside the passenger compartment and was intentionally set by an accelerant and a fire starter. Dr. James Traylor, a forensic pathologist, performed the autopsy on Heather. Somewhat morbidly, he testified he could not tell if she was yet dead from the gunshot when she was incinerated.

The state also offered cell phone forensics. Linda Hollifield, an investigator with the Caddo Parish DA's office, used "Cellhawk" technology to gather data from the phones of various people involved in the case. Shannon Mack, an expert in cell phone forensics, traced Heather's cell moving from Mall St. Vincent at 8:31 pm, through the Queensborough area, and terminating its signal at 9:08 pm. Ms. Mack further found that Tyron

"Black" Bates's phone did not move between 8:34 pm and 9:30 pm; Eric Dorch's phone was at a location consistent with 3632 Penick Street between 8:00 pm and 11:55 pm; and Heather's and Dorch's phones did not intersect at the relevant times.

Finally, Det. Thompson and Sgt. Willhite testified about their interviews with Watkins, as noted above. The videos of the interviews were played for the jury.

For the defense, Det. Jason Saiz, of SPD, testified that he stopped two persons at the liquor store near where the bodies were found; one of these was Bill Ester. Bill Ester testified that he was also at Shawanna's house the night of the incident, as was Tyron "Black" Bates. Watkins did not testify.

## OBJECTION TO PATTERN JURY CHARGE

After the parties rested, the court had a bench conference regarding the jury charge. The defense offered pattern instruction 5:1, regarding voluntariness of statements, and asked that it be included.[3] This provided:

> If the state offers evidence of a statement by the defendant, you must first determine whether the statement was in fact made. You must then consider whether the statement, if made, was accurately recorded or repeated.
>
> If you find that defendant made a statement, you must also determine the weight or value that the statement should be accorded, if any. In determining the weight or value to be accorded a statement made by the defendant, you should consider all the circumstances under which the statement was made. *In making that determination, you should consider whether the statement was made freely and voluntarily, without the influence of fear, duress, threats, intimidation, inducement, or promises.*

---

[3] The pattern is taken from Cheney C. Joseph Jr. & P. Raymond Lamonica, 17 La. Civ. L. Treatise, *Criminal Jury Instructions & Procedures*, 3 ed., § 5.1 (Thomson Reuters ©2012).

The state objected to the *italicized portion*, arguing that it "goes to the admissibility of the statement, which is the trial court's determination, which has already been made." The state argued the jury is to assess only the weight of the statement, not its admissibility.

The court agreed, saying the last sentence "may give the jury the indication that they are to determine whether or not the statements were freely and voluntarily made. That has already been litigated by the court and * * * it may cause confusion to the jury as to their responsibility." Over defense objection, the court excised that portion from the pattern instruction.

## VERDICT AND SENTENCE

After deliberating 1½ hours, the jury returned a verdict of guilty as charged on both counts of first degree murder. On polling, the court found the verdict was unanimous.

Watkins filed several posttrial motions, including one for downward departure from the mandatory life sentences. The court held a sentencing hearing in October 2022, at which it received testimony from Heather's father and sister and from Kelly's daughter, Abby. The defense called no witnesses, but counsel argued that Watkins suffered from a mild mental disability and was the father of three children. The court imposed the mandatory life sentences and ordered them to be served consecutively.

Watkins has appealed, raising three assignments of error.

## DISCUSSION

### *Sufficiency of the Evidence, Identification*

By his first assignment of error, Watkins urges the state failed to prove his guilt beyond a reasonable doubt to the exclusion of every reasonable hypothesis of innocence in this circumstantial evidence case; it

11

also failed to negate the reasonable probability of misidentification beyond a reasonable doubt. He cites the standard of appellate review, *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781 (1979), the state's burden to negate any reasonable probability of misidentification, *State v. Bright*, 98-0398 (La. 4/11/00), 776 So. 2d 1134, and the state's burden, in a circumstantial case, to exclude every reasonable hypothesis of innocence, La. R.S. 15:548.

He argues the case against him was purely circumstantial, with no eyewitnesses, no video, and no fingerprints or DNA at the scene. He contends the evidence showed only that the victims accepted a ride with him at 8:30 pm, and their bodies were discovered at 11:48 pm, but there was little about their movement, other than video showing Heather's car at the Chase Bank around 9:30 pm. He concedes he is the person on the video at the gas station around 11:30 pm but argues this shows him in no hurry – conduct inconsistent with trying to cover up a crime – and shows him on a white or orange bike, putting gas in a clear jug, and wearing a gray or white hoodie – all points inconsistent with trial testimony.

He suggests the killer could have been Billy Moton or Bill Ester, both of whom were detained by police at the liquor store two hours after the bodies were discovered. In support, he shows that Moton was pushing a black bike and Ester was wearing a dark hoodie, items that witnesses described on the fleeing suspect; also, Heather's phone was later discovered at Moton's house. Watkins suggests this is "strong circumstantial evidence" that Moton and Ester were the killers. He also suggests it could have been Tyron "Black" Bates, a known drug dealer and gun thief who lived at Shawanna's house and spent a lot of time at the vacant house where the bodies were found. Finally, he suggests it could have been Eric Dorch, an

12

associate of Bates's, whose phone pinged in an area consistent with the Chase Bank ATM and who eluded the police for five months after this crime.

He proposes that after Heather and Kelly dropped him off at a house in Queensborough, one of these other people could have carjacked them or got in the car with them, and this prospect is strong enough to overcome the circumstantial case against Watkins.

The standard of appellate review for a sufficiency of the evidence claim in a criminal case is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, *supra*; *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604 (2004). The *Jackson* standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a means to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Galloway*, 55,591 (La. App. 2 Cir. 4/10/24), __ So. 3d __.

The *Jackson* standard also applies in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is viewed as such, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable

doubt that the defendant was guilty of every essential element of the crime. *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Galloway*, *supra*.

Likewise, if a case rests essentially on circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. The appellate court will review the evidence in the light most favorable to the prosecution and determine whether an alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *State v. Calloway*, 07-2306 (La. 1/21/09), 1 So. 3d 417; *State v. Galloway*, *supra*.

Where there is conflicting testimony concerning factual matters, the resolution of which depends on a determination of the credibility of the witnesses, the matter is of the weight of the evidence, not its sufficiency. *Tibbs v. Florida*, 457 U.S. 31, 102 S. Ct. 2211 (1982); *State v. Galloway*, *supra*. The appellate court neither assesses the credibility of witnesses nor reweighs evidence. *State v. Kelly*, 15-0484 (La. 6/29/16), 195 So. 3d 449; *State v. Galloway*, *supra*. Rather, the reviewing court affords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Robinson*, 02-1869 (La. 4/14/04), 874 So. 2d 66, *cert. denied*, 543 U.S. 1023, 125 S. Ct. 658 (2004); *State v. Galloway*, *supra*.

In a case where a defendant claims he was not the person who committed the offense, the *Jackson* standard requires the prosecution to negate any reasonable probability of misidentification. *State v. Young*, 20-01041 (La. 5/13/21), 320 So. 3d 356; *State v. Galloway*, *supra*.

We have closely reviewed the evidence, which is extensive and at times digressive. Viewed in the light most favorable to the prosecution, it shows that Watkins had no money on November 7, 2018, when he

14

approached Brian Adler in an apparent effort to rob him, luring him to 3458 Penick St., the same place where the charred bodies of Heather and Kelly were later found. Watkins followed this plan to return his victims to that house on November 8. He spotted and followed the victims at Mall St. Vincent, and then approached them just outside the mall. The victims were last seen alive with Watkins. Heather was forced to withdraw $800 from a Chase Bank ATM on Greenwood Road, an act captured on video showing Kelly lying dead on the console of their Kia and some person visible in the back seat. Both victims were killed by a single gunshot wound to the head. The bullet from Heather's body was forensically matched with the .22 caliber revolver recovered under the house at 3632 Penick St., where Watkins was arrested. The gun was found in the hole through the floor opened and used only by Watkins; officers saw Watkins reach under the house and place some object there. One of the other occupants of the house, Eric Dorch, identified the gun as one he saw in Watkins's possession. Dorch also testified Watkins tried to pay him to help remove prints from the car with two dead people in it. When Dorch would not agree, Watkins borrowed his bike, ostensibly to get something to eat. Dorch stated that Watkins rode away on his bike with a backpack and a fruit punch jug; he identified Watkins as the person seen on the gas station video, riding his (Dorch's) bike. A man on a bike was seen leaving the scene of the fire with a gasoline jug; forensics experts identified gasoline as the accelerant used to burn the victims' bodies. Dorch also testified Watkins had "them people's phone" and a wallet with him on the night of the incident. Cell phone data excluded the phones of Dorch and of Tyron "Black" Bates from intersecting with Heather's phone at the operative times. After the SWAT team

15

surrounded the house at 3632 Penick St., and used tear gas to flush out Watkins, he fled in an effort to avoid apprehension. From this synopsis of the evidence, we find the state proved beyond a reasonable doubt every essential element of two counts of second degree murder.

Because the identity of the offender was contested, the state was required to negate the reasonable probability of misidentification, *State v. Bright*, *supra*. Viewed in the light most favorable to the state, the evidence easily met this standard. Watkins was the last person seen with the victims alive; later, he sought help to dispose of the bodies and clean up the car. These circumstances are highly incriminating. *State v. Quinn*, 19-00647 (La. 9/9/20), 340 So. 3d 829, *cert. denied*, 141 S. Ct. 1406, 209 L. Ed. 2d 139 (2021). The gun that fired the lethal shots was identified as one being carried by Watkins; occupants of the house saw him punch a hole in the floor, through which police officers saw him reach and deposit something under the house. People in the house saw Watkins with "them people's phone." Watkins left the house carrying a container; he was seen buying gasoline at the Clark gas station; gasoline was the accelerant used in the fire. After police surrounded Shawanna's house and used tear gas to flush Watkins out, he fled and concealed himself. These are all markers of Watkins's guilt. *State v. Trammell*, 46,725 (La. App. 2 Cir. 11/9/11), 78 So. 3d 205, *writ denied*, 12-0053 (La. 4/20/12), 85 So. 3d 1269. These circumstances easily excluded any reasonable probability of misidentification.

As in any case of this size and complexity, and using the testimony of sometimes unwilling witnesses, there are minor gaps and inconsistencies in the narrative. For instance, some witnesses thought the bike Watkins was

16

riding did not match Dorch's bike, but Dorch clearly identified it as his own. There was inconsistency whether Watkins was carrying a clear, fruit-juice container to fill with gasoline, or a more conventional red plastic gas can. There was testimony that later in the evening Watkins was not wearing the same hoodie and pants that he was seen wearing at the mall when he left with the Joses. These small evidentiary "problems" do not diminish the thrust of the state's case and do not create a reasonable hypothesis of innocence.

Watkins's effort to shift the blame to other people is equally unavailing. A possible hypothesis is not sufficient, *State v. Captville*, 448 So. 2d 676 (La. 1984). Watkins's hypothesis is that all he did was to stalk the Joses, ask to borrow their phone, accept a ride with them, and they dropped him off somewhere in Queensborough; then, some other person or persons hopped in their car, carjacked them, forced them to drive him to the ATM and withdraw money, and then shot them and incinerated the bodies; but then, in spite having no involvement in the actual crimes, it was Watkins who solicited help to dispose of the bodies, went to get gasoline, and tried to hide the gun under the house. This does not approach a reasonable hypothesis of innocence. Notably, aside from the fact that Moton and Ester were detained by police at a nearby gas station shortly after the incident, there is no other evidence placing them in contact or proximity with the victims. Ester was in possession of Heather's phone, but Dorch testified Watkins sold it to him. Forensic evidence showed that Tyron "Black" Bates's phone did not move between 8:34 and 9:30 pm the night of the crime, and Dorch's phone was in a location "consistent" with Shawanna's

house from 8:00 to 11:55 pm; these findings make their participation purely theoretical.

The state proved every element of the offense and the identity of the offender beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence. This assignment of error lacks merit.

### *Admissibility of Statements*

By his second assignment of error, Watkins urges the court erred in finding his statements to be voluntary and allowing them into evidence where there was evidence of threats, intoxication, and low intellectual ability. He cites the state's burden to prove the defendant received his *Miranda* rights, understood them, and knowingly waived them, *State v. Lewis*, 53,122 (La. App. 2 Cir. 1/15/20), 289 So. 3d 661, and to prove beyond a reasonable doubt that any confession was free and voluntary, *State v. Hills*, 354 So. 2d 186 (La. 1977). He asserts the statements did not admit guilt but were nonetheless prejudicial.

Factually, he argues that his expert, Dr. Sawyer, established a longstanding mild intellectual disability and that officers used deception, evasion, and threats. While the officers took off his handcuffs and gave him water, he argues no exigent circumstances existed for interviewing him predawn, they did not advise him of the reason for his arrest until an hour into the interview, and they did not even use the word "murder" until 3:54 am; they used terms like "death penalty" and "needle" at least four times. He argues the totality of the circumstances rendered his initial statement inadmissible, *State v. Cousan*, 94-2503 (La. 11/25/96), 684 So. 2d 382, and giving him his *Miranda* rights only mid-interview was "ineffective," *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601 (2004).

18

Regarding the second statement, he argues he thought he "had to" talk, the officers made no attempt to find out if he had a lawyer, they gave him a rights form but made no attempt to see that he truly understood it; in short, he did not understand the situation. He argues that diminished mental capacity is a factor in assessing the statement, *State v. Deidrich*, 19-1481 (La. 11/25/19), 283 So. 3d 489, the court should consider the totality of the circumstances, *State v. Fernandez*, 96-2719 (La. 4/14/98), 712 So. 2d 485, and anyone with an IQ between 50 and 69 cannot waive *Miranda*, *State v. Anderson*, 379 So. 2d 735 (La. 1980). He also argues the court should not have relied on Dr. Lobrano's view of his relative competence, as that doctor never actually examined Watkins and he should not have counted his prior *Boykin* hearings as proof that he understood his *Miranda* rights.[4]

Before a confession can be introduced in evidence, the state must affirmatively show that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La. R.S. 15:451; *State v. Sparks*, 88-1107 (La. 5/11/11), 68 So. 3d 435, *cert. denied*, 566 U.S. 908, 132 S. Ct. 1794 (2023); *State v. Lewis*, 53,122 (La. App. 2 Cir. 1/15/20), 289 So. 3d 661, *writ not cons.*, 20-00410 (La. 5/3/22), 337 So. 3d 156. The state must also establish that an accused who makes a statement during custodial interrogation was first advised of his *Miranda* rights and that he understood and knowingly waived those rights. *State v. Deidrich, supra; State v. Lewis, supra.* The *Miranda* warnings must inform the person in custody that he has the right to remain silent, that any statement he does make may be used against him, and that he

---

[4] *Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709 (1969).

19

has a right to the presence of an attorney, either retained or appointed. *State v. Hunt*, 09-1589 (La. 12/1/09), 25 So. 3d 746; *State v. Lewis*, *supra*.

A confession obtained by any direct or implied promises, however slight, or by the exertion of any improper influence must be considered involuntary and inadmissible. *Hutto v. Ross*, 429 U.S. 28, 97 S. Ct. 202 (1976); *State v. Lewis*, *supra*. However, a mild exhortation to tell the truth, or a remark that if the defendant cooperates the officer will "do what he can" or "things will go easier," will not negate the voluntary nature of a confession. *State v. Blank*, 04-0204 (La. 4/11/07), 955 So. 2d 90, *cert. denied*, 552 U.S. 994, 128 S. Ct. 494 (2007); *State v. Lewis*, *supra*. The test of voluntariness is whether the confession was the product of an essentially free and unconstrained choice by its maker; it is assessed on a case-by-case basis under a totality-of-the-circumstances standard. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041 (1973); *State v. Lewis*, *supra*. In addition to age, some factors that have been considered in assessing the totality of the circumstances include the accused's experience, education, background, intelligence, and capacity to understand the warning given at the time of the waiver. *State v. Fernandez*, *supra*.

Moderate mental retardation and low intelligence or illiteracy do not of themselves vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary statement. *State v. Deidrich*, *supra*; *State v. Tart*, 93-0772 (La. 2/9/96), 672 So. 2d 116, *cert. denied*, 519 U.S. 934, 117 S. Ct. 310 (1996). The critical question is whether the defendant has the capacity to understand his constitutional rights and voluntarily, knowingly, and intelligently waive them.

The admissibility of a confession is a question for the trial court. *State v. Hunt*, *supra*. The trial court's conclusions on the credibility and weight of the testimony relating to the voluntary nature of the defendant's confession are accorded great weight and will not be disturbed unless they are not supported by reliable evidence. *State v. Deidrich*, *supra*. Testimony of the interviewing officer alone may be sufficient to prove that the statement was free and voluntary. *State v. Lewis*, *supra*, and citations therein. In reviewing the trial court's ruling on a motion to suppress a statement, the reviewing court is not limited to the evidence adduced at the suppression hearing, but may consider all pertinent evidence adduced at trial. *State v. Sparks*, *supra*; *State v. Lewis*, *supra*.

The most significant evidence was the videotape of the interviews themselves. In the first interview, officers entered at 3:46 am, asked Watkins if he knew why he was being questioned, then asked about his health, identified themselves, asked if he was on drugs or alcohol, and, at 3:54, advised him why he was being questioned. Contrary to the assertion in brief, we do not find a delay of "over half an hour" before advising him of the purpose of the interview. At this point, Watkins had made no statements about the case; officers did not extract a confession first and give *Miranda* later, as occurred in *Missouri v. Seibert*, *supra*. Moreover, Sgt. Willhite advised him early on, "I have to read you your rights before I talk to you about it." The transcript shows that officers ascertained Watkins's level of understanding, and the fact that he was not impaired, before giving him his *Miranda* rights. This was totally appropriate. *State v. Blank*, *supra*. We find no denial of Watkins's *Miranda* rights.

21

Watkins strongly argues the officers used deception, evasion, and threats; for instance, Det. Thompson told him, "That's what's gonna determine, you know, if you're gonna get the death penalty or just whether you're gonna spend the rest of your life in jail.  I mean, it's up to you." However, this was after Watkins denied he had been at the mall in the past few days, a claim refuted by surveillance video.  Det. Thompson's remarks were merely admonitions to tell the truth and, if he did so, his outcome might be better.  This interrogation method is perfectly permissible, *State v. Blank*, *supra*; *State v. Lewis*.  We find no promises, direct or implied, or any improper influence.

The second interview was initiated by Watkins, and Sgt. Willhite immediately told him, "I'm gonna go back to your rights?  You know what you're here for."  After reading him the *Miranda* card, she asked, "No[w], with this understanding and waive [*sic*] those rights, do you want to take – make a statement and talk about this with me and Det. Thompson?" Watkins responded, "Yes, ma'am."  The record shows a timely delivery of *Miranda* rights, a clear waiver, no promises, direct or implied, and no improper influence.

Watkins's principal argument is that his expert, Dr. Sawyer, found a mild intellectual disability, a full-scale IQ of 64, a historical range of 55 to 62, a first- or second-grade reading level, and speech and language difficulties going back to 1996.  Dr. Sawyer concluded that Watkins could not knowingly and intelligently waive his *Miranda* rights.  By contrast, he asserts, Dr. Lobrano never personally examined Watkins, relied solely on old data, and "cherry-picked" information from earlier reports to reach the opposite conclusion.  Of course, the trial court's decision to accept the view

22

of one expert over another is subject to great discretion. *State v. Sparks*, *supra*; *State v. Lewis*, *supra*. It is noteworthy that the district court watched the videos and saw that Watkins, though defensive and reluctant, was not the borderline defective depicted by Dr. Sawyer. It is also notable that Dr. Sawyer disregarded the recurring diagnosis of malingering that permeated Watkins's psychiatric record. Dr. Lobrano also testified that Watkins had been through 21 prior arrests and, from this experience, appeared to be very familiar with the process. On this record, we cannot say the district court abused its discretion in denying the motions to suppress the custodial statements. This argument lacks merit.

### Denial of Pattern Jury Charge

By his second assignment of error, Watkins further urges the district court erred in denying his jury charge on the determination of the weight to be given to the statements. As noted, he requested pattern jury charge 5:1, which included, "In making that determination, you should consider whether the statement was made freely and voluntarily without influence of fear, duress, threats, intimidation, inducements, or promises." He contends that this charge required no qualification, limitation, or explanation, La. C. Cr. P. art. 807, and he was entitled to offer evidence of the circumstances surrounding the confession, *State v. Williams*, 01-1650 (La. 11/1/02), 831 So. 2d 835; *State v. Cope*, 48,739 (La. App. 2 Cir. 4/9/14), 137 So. 3d 151, *writ denied*, 14-1008 (La. 12/8/14), 153 So. 3d 440. The proposed charge, he argues, would have allowed the jury to consider the level of psychological intimidation exerted by the officers and the general "mishandling" of the statements. Specifically, he contends the jury should have been allowed to consider whether he was, or believed he was, coerced,

23

threatened, or induced to make the statement. Finally, he submits this cannot be harmless error, as the verdict was not "surely unattributable to the error," *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967); *State v. Seals*, 95-0305 (La. 11/25/96), 684 So. 2d 368.

The state and the defendant have the right before argument to submit to the court special written charges for the jury. A requested charge "shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent." La. C. Cr. P. art. 807; *State v. Perkins*, 13-1917 (La. 9/3/14), 149 So. 3d 206; *State v. Haire*, 55,289 (La. App. 2 Cir. 2/28/24), 381 So. 3d 230. The charge, however, must be supported by the evidence. *State v. Perkins*, *supra*; *State v. Haire*, *supra*. Failure to give a requested jury charge constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. La. C. Cr. P. art. 921; *State v. Perkins*, *supra*; *State v. Haire*, *supra*.

Pattern charge 5:1 apparently encompasses the notion that the jury is not absolutely barred from considering an involuntary statement. *Arizona v. Fulminante*, 499 U.S. 279, 111 S. Ct. 1246 (1991). This court has previously approved the use of pattern charge 5:1, as written. *State v. Grady*, 47,622 (La. App. 2 Cir. 1/16/13), 108 So. 3d 845, *writ denied*, 13-0294 (La. 10/4/13), 122 So. 3d 551. In *Grady*, however, the defendant did not argue that the jury could use the circumstances of the statement to overrule the court's finding as to admissibility.

Here, the court found the contested language "may give the jury the indication that they are to determine whether or not the statements were freely and voluntarily made." Finding this was a legal determination to be

24

made by the court, not by the jury, the court struck the contested language. The remaining charge correctly advised the jury to determine the weight or value the statement should be accorded, if any, and to consider "all the circumstances under which the statement was made." On these particular facts, we detect no abuse of discretion.

Moreover, the statements contained no confession or admission of guilt. At worst, they showed Watkins changing his story, admitting certain peripheral details, and sounding perhaps evasive or uncandid. Given the strength of the state's case, we find the verdict was surely unattributable to the use of Watkins's statements. *Chapman v. California*, *supra*; *State v. Seals*, *supra*. This argument lacks merit.

### Excessive Sentence

By his third assignment of error, Watkins urges that his consecutive sentences are excessive, cruel, and unusual punishment. He concedes that life without benefits is mandatory for noncapital first degree murder, La. R.S. 14:30 (C)(2), but argues that even a sentence within statutory limits may still violate a defendant's constitutional right against excessive punishment, *State v. Kennon*, 19-00998 (La. 9/9/20), 340 So. 3d 881. Chiefly, he argues that concurrent sentences are the rule for offenses that arise out of the same act or transaction, or constitute parts of a common scheme or plan, La. C. Cr. P. art. 883; *State v. Gaspard*, 09-1516 (La. App. 3 Cir. 10/13/10), 49 So. 3d 971. While any homicide is violent, he asserts a gunshot wound to the head is "instant," and the burning of the bodies, "though grotesque," was postmortem and caused no additional pain. He submits these facts warrant concurrent, instead of consecutive, sentences.

25

Review of sentences for excessiveness is usually a two-prong process, the first prong being a check of the trial court's compliance with the guidelines of La. C. Cr. P. art. 894.1. However, when there is a mandatory sentence, there is no need for the trial court to justify, under Art. 894.1, the sentence it is legally required to impose. *State v. Parker*, 54,947 (La. App. 2 Cir. 3/1/23), 358 So. 3d 220, *writ denied*, 23-00417 (La. 10/3/23), 370 So. 3d 1073, and citations therein. The mandatory sentence for noncapital first degree murder is life at hard labor without benefits, R.S. 14:30 (C)(2). A defendant may attempt to rebut the presumption that a mandatory minimum sentence is constitutional, but he must show, clearly and convincingly, "because of unusual circumstances, he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case." *State v. Johnson*, 97-1906 (La. 3/4/98), 709 So. 2d 672; *State v. Parker*, *supra*. The mere fact that a defendant's criminal history is nonviolent does not meet this burden. *State v. Wilson*, 01-2815 (La. 11/22/02), 836 So. 2d 2. Watkins's criminal history, though nonviolent, is extensive; his mild mental disability and parental status do not strike us as justifying a downward departure from the mandatory life sentence.

The second prong is constitutional excessiveness. A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the severity of the crime or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); *State v. Bonanno*, 384 So. 2d 355 (La. 1980). When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently "unless the court

26

expressly directs that some or all be served consecutively." La. C. Cr. P. art. 883. However, concurrent sentences arising out of a single course of conduct are not mandatory, and consecutive sentences are not necessarily excessive. *State v. Jamison*, 55,361 (La. App. 2 Cir. 11/29/23), 375 So. 3d 619, and citations therein.

In imposing sentence, the court took judicial notice of Watkins's mental health, but found this negated by the facts of the crime:

> [T]he victims were tortured by the defendant with the wife, * * * as we could see on the bank cameras at the ATM, that the husband appeared to be already deceased being shot by the defendant and having the wife drive around * * * and continue to drive to the bank with her husband lying deceased in the car. * * *
>
> [W]hen the victims were found, it caused a tremendous amount of suffering on the [survivors,] and I believe that they will be suffering for the rest of their lives on this matter.
>
> The crime itself was committed in such a cruel and heinous and violent nature and this is all after the victims totally complied with the defendant and were attempting to help the defendant because they were sympathetic to him and he simply stalked them, as we could see on video, picked them out, recognizing their kindness and targeted that particular family.
>
> The defendant showed no mercy toward the victim[s]. The victims were in terror, I suppose, as this was going on, knowing what could happen, but the defendant, without remorse, carried out to the fullest extent and even went further by buying gasoline, setting the car on fire with the victims inside, possibly one victim may still have been alive at the time.

These reasons amply justify the selection of consecutive sentences for these offenses. Nothing in the record supports concurrent sentences. To the contrary, this record supports the finding of Watkins's utter disregard for the dignity of human life. He is one of the worst offenders. There was no abuse of discretion.

This assignment lacks merit.

27

## CONCLUSION

For the reasons expressed, the convictions and sentences are affirmed.

**AFFIRMED**.